STATE OF NEBRASKA, APPELLEE, v. LANNIE ROSS, APPELLANT.

157 N. W. 2d 860

Filed April 5, 1968.   No. 36513.

Lannie Ross and John E. North, for appellant.

Clarence A. H. Meyer, Attorney General, and Chauncey C. Sheldon, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SPENCER, J.

This is an appeal from a manslaughter conviction which arises out of an incident on March 2, 1966, at the Gridiron Bar in Omaha, Nebraska.

The defendant arrived at the bar sometime around 3 p. m., and spent the next 3 hours drinking beer and playing pool. Sometime after 6 p. m., defendant became involved in a dispute with a woman at the bar, accusing her of taking $10 of his change which he had left on the bar when he went to the restroom. This woman, who was a friend of the bartender, testified that both she and the defendant were intoxicated at the time. The bartender, Robert Goedert, the deceased, became involved in the argument when he refused to call the police in connection with the dispute. Goedert, who had been serving someone seated at a table, walked behind the serving bar, picked up a 45-caliber revolver, and fired it either at the floor or at the defendant. There is a dispute as to whether this bullet hit the floor near the defendant or struck the defendant. It was the defendant's testimony that the bullet struck him in the left shoulder, fracturing his clavicle. He further testified that after this shot, he went about 3 feet to his jacket which was hanging on a nearby booth, secured a 22-caliber automatic from the jacket, and began shooting at Goedert and continued to do so until the gun was empty, when he fell down. Without question, Goedert fired the first shot. There is a dispute as to whether defendant was hit a second time bfore he started shooting, and

whether he pulled the gun from his pant's pocket or secured it from his jacket.

A police officer took a statement from defendant about 8 p. m. that same night at the hospital while the defendant was in the operating room being prepared for surgery. The officer testified that defendant told him the bartender fired a shot into the floor, and that defendant then reached into his right front pocket for his gun and started shooting. The officer admitted under cross-examination that defendant was squirming and moaning, was in quite a bit of pain, and possibly was under sedation. The attending doctor testified defendant was in considerable pain from his wounds; that the resident doctor had been giving him fluids and blood; and that he was in shock at the time he entered the hospital.

The officer's testimony, which is uncorroborated is that he advised the defendant who he was; told him he wanted to talk to him in regard to the shooting at the Gridiron Bar; that under the Constitution defendant had a right not to answer any question that he asked him; and that defendant interrupted him, saying: " 'Well, I know this, I know that. I will tell you about what I know.' Then I says, 'You also have a right to an attorney.' He says, 'I am aware of this. I just want to tell you about what happened.' " The officer then recited what he claims the defendant told him, including the following: "He said he had been in the bar all day, drinking; * * * The argument became very violent, and the bartender took and picked up a gun from behind the bar and fired a shot into the floor at him. He said he walked—reached in his right front pocket and pulled his gun and shot the bartender." On cross-examination, this officer stated defendant told him his jacket was out in his car. All the other testimony, both for the State and for the defense, has the jacket hanging near the third booth from the west in the bar.

Another officer went to the hospital at 5:30 p. m. the next day, ostensibly to question defendant about a coat

found in the bar. When he arrived in the room, there were two other police officers present. He testified that defendant was conscious, and that he told defendant he was a police officer and wanted to ask some questions regarding a coat picked up at the bar following the shooting. On cross-examination, the officer admitted he had been told defendant was under sedation. The doctor testified defendant was being given demerol.

This officer testified he attempted to advise defendant of his constitutional rights and defendant got angry, told him he knew his rights better than the officer did, and explained them to him. The officer was not asked what the defendant told him his rights were, nor were the other two officers who were present called to corroborate this testimony. A portion of the statement taken is as follows: "He said the bartender and he engaged in an argument, and the bartender told him if he wanted the police the phone was at the door, to call them himself. He told me that they argued further and the bartender produced a gun from behind the bar and fired a shot. He told me that he then returned to the area of the pool table where he had a jacket hung and took a gun from the pocket of the jacket. He then returned toward the bar, and he was shooting as he came toward the bar. He said he continued walking and walked on out of the bar. He had been hit by some shots from the bartender as he was returning the fire. He told me he continued from the bar to the apron of a service station, where he fell down." The officer was then asked: "Q. With reference to the first shot that the bartender fired, did the defendant, Ross, say that this shot hit him? A. No, sir." Defendant has no recollection of either officer ever talking to him. The testimony of the State's eyewitness is that defendant fell to the floor of the bar. This witness further observed defendant lying on his stomach in the back doorway. Defendant was subsequently found lying on the apron of a nearby service station.

Doctor Carl W. Sasse, Jr., who was the doctor on call at the Douglas County Hospital when defendant was brought in, testified that defendant was shot in the left shoulder; that this bullet went through his clavicle and lodged in his back; and that he also had a bullet hole in the right side of his abdomen and several bullet holes in his left side. The entrance to the wound in the shoulder was from the front. The entrance to the wound to the abdomen was on the right. It went through the large bowel and through the blood supply of the small bowel, and out the left side. There were several bullet holes in the small bowel. Doctor Sasse was asked if the stomach wounds could have been caused by one shot which entered the abdomen. He answered "Yes," and was then asked if it could have been caused by two bullets. The State objected on the grounds that the question was speculative, and the objection was erroneously sustained. This was an important point for the defense, because Goedert only fired three times and the State was contending one of the bullets went into the floor, but made no effort to produce the spent slug.

Three spent shells and three live cartridges were found in Goedert's gun. Defendant testified his gun had six live cartridges at the time he entered the bar. Five empty 22-caliber casings were found at the scene. The gun was empty when found. Goedert's death was due to a massive hemorrhage, secondary to a gunshot wound of the chest. The pathologist testified: "I thought he was hit five times, but one of the wounds was a through-and-through wound, which would make six. I think six openings is all I found. Q. It is possible that one bullet could cause two openings, isn't that correct? A. Yes."

Defendant's plea was self defense. It cannot be denied that the oral confessions to the two officers were a vital and essential part of the State's evidence, and contradicted the trial testimony of the defendant in material respects. In passing, it might be noted that in some

respects this testimony contradicted the testimony of the State's eyewitnesses.

The question immediately apparent is whether these statements may be considered as voluntary confessions as a matter of law on the record herein. Without question, defendant at all times was under sedation. At the time of the first statement he was being prepared for surgery; was receving blood and fluid; was in shock, squirming, and moaning; and admittedly was in considerable pain. We do not question the propriety of the officer who interviewed him on the operating table in attempting to learn what happened. The defendant appeared to be fatally shot and might conceivably never recover sufficiently to be able to tell what happened. What we do question is the finding that a statement taken under such circumstances can be considered voluntary as a matter of law.

For some unaccountable reason, defense counsel did not require a preliminary determination of the voluntariness of the confessions nor object to their admission nor raise the issue of their voluntariness when they were introduced in evidence. However, the issue of voluntariness was presented by cross-examination as well as by direct evidence. In Kitts v. State, 151 Neb. 679, 39 N. W. 2d 283, we determined that where the court properly admits evidence of a confession challenged as involuntary by defendant's evidence, it is prejudicial error to fail to submit to the jury for its determination, under appropriate instructions, the factual question of whether defendant's alleged confession was voluntary, in which event it would be considered as any other evidence, or whether it was involuntary, in which event it should be wholly rejected and disregarded. The trial court herein failed to submit this instruction, nor did the defendant request its submission. This fact, however, is immaterial. Under the evidence, the voluntariness of the confessions was an important issue in the case and required an instruction.

The rule is well established in this jurisdiction that it is the duty of the trial court to instruct the jury on the law of the case whether requested to do so or not.  State v. Breaker, 178 Neb. 887, 136 N. W. 2d 161.

The question of the voluntariness of an oral or written confession is an essential fact issue.  Our law requires its ultimate resolution by the jury.  The failure of the court to instruct on this material issue when it was raised by the defendant's evidence constituted a withdrawal of this vital issue by the trial court from the consideration of the jury.  By failing to submit this issue, the trial court determined the confessions to be voluntary as a matter of law.

The trial herein began August 31, 1966.  Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A. L. R. 3d 974, was released June 13, 1966, and therefore is applicable herein.  That case holds:  "* * * the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

Without specifically detailing the facts, other than that defendant was under constant observation and that two officers were present in his room after his surgery, we are satisfied that we are dealing with custodial interrogation herein.  The question then is presented as to whether the warnings given were sufficient to constitute a waiver of those required by Miranda v. Arizona, *supra*.  Without considering, in either case, the condition of defendant at the time, we still find they were not.

The operating table warnings told the defendant that he had a right not to answer questions, as well as the right to have an attorney.  He was not told that any-

thing he said could be used against him in a court of law, and that if he could not afford an attorney one would be appointed for him prior to any questioning.

The testimony as to the hospital bed interrogation the next day is to the effect that the defendant said he knew his rights better than the officer. The officer testified defendant explained his constitutional rights to him, but did not testify as to what the defendant told him they were. There is, therefore, no way to know whether or not the defendant actually understood what those constitutional rights were. The following from Miranda v. Arizona, *supra,* is pertinent: "The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so, simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clear-cut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time.

"The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of foregoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest. * * *

"In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him."

The argument is made that the defendant stated he knew his rights. Forgetting for a moment the circumstances under which the statement may have been made, can anyone be sure that he was fully informed of those rights unless the full Miranda warning was given? As the court said in Miranda v. Arizona, *supra:* "The mere fact that he signed a statement which contained a typed-in clause stating he had 'full knowledge' of his 'legal rights' does not approach the knowing and intelligent waiver required to relinquish constitutional rights."

The judgment of the trial court is reversed and the cause is remanded for a new trial.

REVERSED AND REMANDED.