237 So.2d 737 (1970)
STATE of Florida, Petitioner,
v.
Ralph CRAIG, Respondent.
No. 38179.
Supreme Court of Florida.
June 17, 1970.
Rehearing Denied July 17, 1970.
*738 Earl Faircloth, Atty. Gen., and Charles W. Musgrove, Asst. Atty. Gen., for petitioner.
L.B. Vocelle, Vero Beach, and C. Wendell Harris, Merritt Island, for respondent.
ADKINS, Justice.
This cause is before the Court for review on conflict certiorari of the decision of the District Court of Appeal, Fourth District, reported in Craig v. State, 216 So.2d 19.
The defendant was charged by an indictment with murder in the first degree and the jury returned a verdict finding him guilty of murder in the second degree. During the trial a statement made by the defendant was admitted into evidence. The District Court held that sufficient preinterrogation warnings were not given defendant and the record failed to show that defendant waived his right to counsel because during the interrogation he stated that "in a way" he would like to have an attorney but concluded that he did not "see how it can help me."
At about noon on Saturday, the day after the homicide, defendant voluntarily surrendered to Deputy McCants, who immediately advised him not to make any statements. The defendant insisted upon talking and made inquiry as to the condition of the victim. He was told that the victim had died.
After the defendant was transported to the jail, Inspector Pease orally warned him of his rights to have an attorney and to remain silent. Defendant was also warned that anything said could be and would be used against him in court. Inspector Pease put these warnings in writing, explaining each of them as they were being written. This procedure continued for 30 or 45 minutes. The defendant signed his name by each written warning as it was explained to him. The result was the following:
"1. `I have been advised of my rights to an attorney.' (signed) Ralph Craig,
"2. `I have been advised that if I cannot afford an attorney the Court will furnish me with one.' (signed) Ralph Craig,
"5. `I have been advised, that if I wish to have anyone else present while I make a statement, that I may do so and that if I wish to talk to anyone *739 before I make a statement, I am free to do so.' (signed) Ralph Craig,
"6. `I fully understand the above and I wish to waiver my above rights and make a free and voluntary statement concerning the charge against me.' (signed) Ralph Craig."
In the meantime, the family of defendant had secured counsel for him and had notified a deputy that the defendant had an attorney. Before Inspector Pease began his explanation of defendant's rights, the defendant was given an opportunity to make telephone calls and to communicate with any person outside the jail. The defendant refused to make any telephone calls and expressed no desire to communicate with anyone. This opportunity was available to the defendant Saturday afternoon and Saturday night.
On Sunday morning an Assistant State Attorney came to the jail with the official court reporter and an investigator for the purpose of interrogating the defendant. Once again the defendant was warned in the following manner:
"Q * * * You signed your name to a bunch of questions here which were witnessed by someone else, concerning your rights, and do you recall doing that?
"A Yes, sir.
"Q O.K. Let me go ahead and warn you again, and just so it will be down. Now, the way I am doing it, I know you can't read, so you don't have to read anything. You are just talking, and so nothing can be changed by somebody writing. And let me advise you first that you have a right to a lawyer, and you have a right to a lawyer even if you can't afford one, and if you can't afford one at this time, or at any other time in the future, the Court will appoint one for you whether you can afford one or not. Now, do you understand that?
"A Uh, huh.
"Q O.K. Tell me, just tell us you understand it.
"A All right.
"Q Do you understand that? Just say you do.
"A I do." (Emphasis supplied)
The Assistant State Attorney then advised defendant that anything he said could be used against him and would be used against him in Court. Defendant was advised that a charge of first degree murder was pending against him and he was being held on this charge. The defendant admitted that no one had threatened him or made any promises to him. In fact, defendant said "they have treated me as good as anybody ever treated me." The following then occurred:
"Q O.K. And do you wish to waive your right to an attorney and make a statement now?
"A I will make a statement, but I ain't anxious to get no lawyer because I don't think it will help.
"Q O.K. Do you want to just say you waive your right to have one right now? Just say that if you do.
"A Well, I would like to have one in a way, but I don't see how it can help me.
"Q O.K. Do you want to make a statement now?
"A Well, I was going to make one to him.
"Q O.K. That is what I mean. In your own words, tell me.
"A What happened, I was going to make one.

*740 "Q What?
"A What happened and how it happened.
"Q That is what I mean. Just tell me in your own words what happened."
When the above factual situation is considered, it is apparent that the decision of the District Court conflicts with Ortiz v. State, 212 So.2d 57 (Fla.App. 3d Dist. 1968) as well as Key v. State, 194 So.2d 664 (Fla.App. 1967). We have jurisdiction.
Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), sets out the standards required in advising defendant of his constitutional rights, but does not require the officer to give these standards verbatim as set forth in the opinion of the Court. The Miranda decision only requires that the defendant be adequately and fully informed of these rights prior to the time any interrogation takes place.
In the case sub judice the defendant voluntarily surrendered himself to the officer and admitted that he was treated well while in custody. From the very beginning he was advised to remain silent. He was adequately advised as to all of his rights under the Miranda decision on Saturday afternoon and again on Sunday morning, and he was not prevented from securing counsel. Finally, defendant said he was not anxious to get a lawyer because he didn't think it would help him.
If the defendant felt that his welfare would best be served without an attorney, he certainly had the right to proceed with the statement in the absence of counsel. When defendant expressed the opinion that an attorney could not help him, the interrogator was not required to convince the defendant that he needed counsel. The Miranda decision does not require the interrogator to give legal advice, but only that defendant is told his constitutional rights and makes an intelligent waiver of counsel. The determination for need of counsel is the defendant's prerogative.
In Brisbon v. State, 201 So.2d 832 (Fla. App. 3d Dist. 1967), the Court said:
"Miranda v. State of Arizona, * * requires that a waiver of defendant's right to counsel be made knowingly and intelligently. However, the Fifth Circuit Court of Appeals, speaking in reference to the Miranda decision, in Narro v. United States, 370 F.2d 329 (5 Cir.1966), has said:
"`Thus the cases in which it is clear that the warnings have been given must be considered on their own facts in order to determine the question of waiver.'
"While it is true that mere silence on the part of the defendant cannot be presumed to be a waiver, it is also true that the defendant need not make the express statement, `I do not wish to be represented by counsel' before a waiver can occur. People v. Salcido, Cal. App. 1966, [246 Cal. Rptr.2d 450] 54 Cal. Rptr. 820. To require such statement would be to require form without substance. The only test is whether the defendant, after being warned of his rights, knowingly and intelligently waived his right to counsel.
"The record before us indicates that in response to the question, `knowing your rights as they have been related to you, are you now willing to answer questions without having an attorney present?', the defendant answered, `Yes' and proceeded to answer the questions put to him by the police officer."
In discussing the strong presumption against waivers and the standards of proof needed to overcome the presumption, the Court in the Miranda decision relied upon Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. *741 1019, 82 L.Ed. 1461 (1938), in which the Court unequivocally stated:
"The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." See United States v. Hayes, 385 F.2d 375 (4th Cir. 1967).
The Miranda decision never contemplated that waiver of counsel could be accomplished only by the use of the words, "I am willing to answer questions without the services of a lawyer." There is no magic in these words. Any clear and unambiguous conduct by a person who has been advised of his rights which indicates his willingness to answer questions without a lawyer is surely sufficient. A verbal acknowledgment of understanding and willingness to talk, followed by conduct which is consistent only with a waiver of his right to have a lawyer present, by one who has been advised of his rights, constitutes an effective waiver of his right to counsel at that stage of the proceeding.
In determining whether proper warnings with respect to right to counsel and right to remain silent have been given to a suspect, factors to be considered are whether the suspect understood that he did not have to speak, the consequences of speaking, and that he had a right to counsel before and while doing so if he wished.
A statement by the accused that he fully understands and waives his rights is not an essential link in the chain of proof. Waiver may be shown by attendant circumstances. United States v. Hayes, 385 F.2d 375 (4th Cir.1967), certiorari denied, 390 U.S. 1006, 88 S.Ct. 1250, 20 L.Ed.2d 106 (1968).
For the foregoing reasons the decision of the District Court is quashed and the cause is remanded with directions that the judgment and sentence of the trial court be affirmed.
DREW, CARLTON and BOYD, JJ., concur.
MANN, District Court Judge, dissents with opinion.
MANN, District Court Judge (dissenting).
After a Friday night tavern argument which culminated in Craig's shooting Aughtman Cruce he fled, then later surrendered to officers voluntarily. Their efforts at interrogation are explained in the transcript:
"Q * * * I hand you State's Exhibit SS for identification, and ask you were you at the jail on Saturday, November 19, 1966, when the defendant, Ralph Craig, arrived?
"A Yes, sir, I was.
"Q And at that time did you orally warn him of his rights?
"A Yes, sir, I did.
"Q Okay. Now, did you do it on more than one occasion?
"A Orally and written, yes, sir.
"Q Now, did you warn him of the rights as contained on the Exhibit SS, orally first?
"A Possibly, partially, I don't remember offhand whether I advised him all that is on here or not.
"Q What rights did you warn him of?
"A Of his rights to an attorney, his rights to remain silent, that anything he said may be used against him in court and would be used against him in court of law. I mainly tried to keep him silent until such time as I could write this out.

*742 "Q Then after, then did you warn him of the rights as contained on that document?
"A Yes, sir, I did.
"Q And is that your handwriting?
"A Yes, sir, it is.
"Q And did the defendant sign it at the places where it is indicated on there?
"A Yes, sir, he did.
"Q And was it read orally to him?
"A Yes, sir.
"MR. JACKSON: I would like to offer State's Exhibit SS into evidence. It is the same statement.
"MR. HARRIS: May I inquire?
"THE COURT: Yes, sir.
"BY MR. HARRIS:
"Q Mr. Pease, you knew, of course, that the defendant, Ralph Craig could not read, did you not?
"A It was my understanding that he couldn't read very well.
"Q Then you knew that at the time that you wrote this statement, did you not?
"A I believe so.
"Q And the language used is your words and not his words on this statement although the sentences begin with `I,' isn't that correct?
"A I wrote them down, yes, sir.
"Q Well, he never used words like `duress,' for example, did he?
"A No sir.
"Q That is your word?
"A That is my word.
"Q And your writing?
"A My writing, yes, sir.
"Q And who else was present at this time?
"A The first time I believe Lieutenant McCants was, of the Indian River County Sheriff's Department. There possibly could have been somebody else I don't remember. The second time I believe possibly Hal Bridwell, I am not sure, or Lieutenant McCants and Mr. Montgomery.
"Q And this interrogation was held in the interrogation room of the Indian River County Sheriff's Department?
"A The advising of his rights, yes, sir. Not in  no, sir, I stand corrected. Not in the interrogation room, no, sir. In our office, the office used by the investigators.
"Q And you knew of course, at that time that Mr. Craig was of very limited education?
"A I had reason to believe that, yes, sir.
"Q You knew it at that time, didn't you?
"A Yes, sir.
"Q Did you advise Mr. Craig that his family had retained an attorney for him at that time?
"A No, sir, I didn't."
Craig signed a statement which complies with Miranda, acknowledging that he was advised of his rights, but it contains no mention of the shooting for reasons which are clear from the transcript of the next day's interrogation.
Sometime "shortly after ten o'clock" on Sunday morning Craig's attorney was in the jail and asked to see him. There is a memorandum which states that when the statement was finished the jailer "advised this RO that Mr. L.B. Vocelle, attorney at law, was in the jail office and wished to *743 speak to the defendant at this time." Craig was then allowed to see his counsel.
A longer excerpt from the transcript of the questionable statement follows:
"Q Ralph, I just got back from Fort Lauderdale. I was down there when all this happened, and you know that I am the Assistant State Attorney?
"A Yes.
"Q And Jim has told me that you talked to him and gave your side of it, what happened, and so forth. So Mr. Gaffney here is the Court Reporter, and before you say anything I want to warn you of your rights, see, and you give your side of it, like you have done before. I think you have talked to Jim and he knows that you 
"A I told him I would give him a statement if my mother was there, because I can't read.

"Q Right. Now, we are not going to ask you to do that or anything. You can't read. Can you write?
"A Yes, I can write.
"Q But you can't read?
"A No.
"Q We are not going to ask you to do that. You signed your name to a bunch of questions here which were witnessed by someone else, concerning your rights, and do you recall doing that?
"A Yes, sir.
"Q O.K. Let me go ahead and warn you again, and just so it will be down. Now, the way I am doing it, I know you can't read, so you don't have to read anything. You are just talking, and so nothing can be changed by somebody writing. And let me advise you first that you have a right to a lawyer, and you have a right to a lawyer even if you can't afford one, and if you can't afford one at this time, or at any other time in the future, the Court will appoint one for you whether you can afford one or not. Now, do you understand that?
"A Uh, huh.
"Q O.K. Tell me, just tell us you understand it.
"A All right.
"Q Do you understand that? Just say you do.
"A I do.
"Q O.K. And that anything you say can be used against you, and it can be used against you in court and will be used against you in court, maybe, see? I mean it can be and will.
"A I understand.
"Q O.K. And do you understand that there is presently a charge against you of first degree murder, and you are presently being held in the Indian River County Jail?
"A I understand that, too.
"Q O.K. What time do you have now  10:10 A.M. And you just walked in the room just this minute, right?
"A Yes, sir.
"Q O.K. Now, let me ask you this. Do you understand the questions that I have just mentioned? Has anybody before this time, or now, ever threatened you or made any promises or threats or anything else?
"A No.
"Q Have they treated you O.K.?
"A They have treated me as good as anybody ever treated me.

*744 "Q O.K. And do you wish to waive your right to an attorney and make a statement now?
"A I will make a statement, but I ain't anxious to get no lawyer because I don't think it will help.
"Q O.K. Do you want to just say you waive your right to have one right now? Just say that if you do.
"A Well, I would like to have one in a way, but I don't see how it can help me.
"Q O.K. Do you want to make a statement now?
"A Well, I was going to make one to him.
"Q O.K. That is what I mean. In your own words, tell me.
"A What happened, I was going to make one.
"Q What?
"A What happened and how it happened.
"Q That is what I mean. Just tell me in your own words what happened. Now, had you been having trouble with Aughtman before? Let me start it that way.
"A Yes, but every time I have had trouble with him I never started it. He just walks up to me when he is drinking and pulls a knife. They ran me out of the Sugar Mill one time with a piece of pipe, him and his brother.
"Q O.K. This is what we are interested in, the whole thing."
The state argues two cases as in conflict with the decision of the Fourth District Court of Appeal. These are Ortiz v. State, Fla.App. 1968, 212 So.2d 57, and Key v. State, Fla.App. 1967, 194 So.2d 664.
Key is not even remotely in point. There post-conviction relief was sought from judgments founded on guilty pleas after "the trial judge patiently and meticulously explained to the defendant his right to counsel, and questioning by the court brought answers from the defendant which disclosed he understood his right to counsel and the effect of proceeding without counsel." I cannot find the slightest merit in the suggestion that Key is in conflict with the Fourth District's decision in Craig, or that the Fourth District would have decided Key differently.
Ortiz is a more difficult problem. The record in Ortiz, which I have examined, indicates that the warnings quoted in the footnote to that case were found insufficient by the trial judge, and Ortiz' statement was admitted only after further questioning. I agree that Ortiz was rightly decided, however, as I think this case was in the District Court, and that the opinion was not intended as a full-scale exposition of the point of law involved. Even so, it is impossible to find conflict between Ortiz and Craig, without misinterpreting Miranda. It is possible to find these cases in conflict if we view Miranda warnings as a ritual incantation required to be delivered in some set manner. I reject this view.
For example, if the record reflects knowledge of rights other than through the ritual reading from a "rights card" the element of understanding is present. Consider Commonwealth v. Schwartz, 1967, 210 Pa.Super. 360, 233 A.2d 904, in which a judge who was charged with embezzlement was held to have understandingly waived his right to silence although no Miranda warning was given.[1] On the other *745 hand, Craig's conversation with the officers indicates misunderstanding of the extent and immediacy of his right to counsel. There is nothing in Ortiz to indicate a similar misunderstanding.
What we must look for in these cases is both understanding and waiver. Both are lacking here. The facts vary so widely from Ortiz that I cannot find that the Fourth District has applied a rule in Craig different from that applied by the Third District in Ortiz. Only if Miranda is held to prescribe some set ritual incantation, which is sufficient to show understanding regardless of the suspect's reaction can we hold the Fourth District in error here.
There is a suggestion in Frazier v. Cupp, 1969, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684, which involved a confession taken prior to Miranda, that an indication on the suspect's part that he "had better get a lawyer" might require cessation of inquiry if Miranda were operative
I would not go as far as the Tenth Circuit Court of Appeals in Sullins v. United States, 1968, 389 F.2d 985, which seems to require a positive rejection of counsel. But the majority in this case mistake confusion and ambiguous conduct for a clear and unambiguous waiver. Such a holding, constitutional or not  and I think it is not  makes a fuzzy standard for our policemen to follow.
I agree with Judge Friendly's thesis[2] that the Constitution is ill adopted as a precise code of criminal procedure.
What the majority do here is encourage law enforcement officers to speculate whether an accused who indicates confusion and a desire to speak to his already retained attorney understands and waives his right to counsel. It is better to require a clear waiver. The consequence of today's decision is that Florida's law enforcement officers, who are presently following Miranda admirably, are encouraged to proceed without caution when proceeding with caution it is so simple.
It is this court's mission to clarify the law, not confuse it. I would discharge the writ as unwisely, if not wrongly, granted.[3]
NOTES
[1] But cf. State v. Ross, 1968, 183 Neb. 1, 157 N.W.2d 860; Cardwell v. Commonwealth, 1968, 209 Va. 68, 161 S.E.2d 787; Montoya v. United States, 5 Cir., 1960, 392 F.2d 731. In Dickey v. State, Wyo. 1968, 444 P.2d 373, an accused known to be financially able to employ counsel, was not advised of his right to appointed counsel. The statement was properly admitted. See footnote 43 to Miranda v. Arizona, 1965, 384 U.S. 436, 86 S.Ct. 1602, 384 U.S. 436. The California Supreme Court has said that the purpose of Miranda warnings is to establish safeguards which free courts from the necessity of adjudicating whether coercive influences have been used to obtain confessions. People v. Fioritto, 1968, 68 Cal.2d 714, 68 Cal. Rptr. 817, 441 P.2d 625.
[2] Benchmarks. His chapter entitled "The Bill of Rights as a Code of Criminal Procedure," also appears as an article at 53 Cal.L.Rev. 929 (1965). His chapter on Miranda is not published elsewhere.
[3] Both the District Court and this one do not discuss Escobedo v. Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. Discussion of Escobedo, which may have underlain Judge Cross' concurrence in the result, was unnecessary there, but not on the view of the case taken by the majority here.