No. 46,887

STATE OF KANSAS, *Appellee*, v. GERALD D. BRUNNER, *Appellant*.

(507 P. 2d 233)

Opinion filed March 3, 1973.

*John F. Christner,* of Abilene, argued the cause and was on the brief for the appellant.

*Max M. Hinkle,* county attorney, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: Gerald D. Brunner, the defendant-appellant, was convicted of involuntary manslaughter as the result of a one-car accident in which two passengers in his automobile were killed. He was acquitted of a charge of illegally transporting an open bottle of liquor arising out of the same incident. On appeal he alleges error in the introduction into evidence of admissions elicited from him and the results of a blood alcohol test. Both the admissions and the blood sample were procured while he was hospitalized and in a state of shock and confusion shortly after the accident. Both issues were raised on a pre-trial motion to surpress, at trial, and by motion for a new trial.

The accident happened about 9:30 p. m. on November 21, 1970, on a county road about eight miles west of Herington, near Hope, Kansas. Defendant, a friend named Mike Wandgrin, two young women, and a baby were all en route from Herington to Abilene in defendant's car when it went off the road. One of the young women died at the scene and the other a few hours later at the hospital.

The defendant was observed by the ambulance driver to be "in the vehicle lying between the front and back seat." He was taken to the Herington hospital where shortly after 10:30 he was diagnosed as suffering from acute circulatory shock, mild brain concussion and a broken hand. As described by the attending physician, he "was experiencing pain, he was conscious, confused

and somewhat irrational." He was given a sedative, and between 11:00 and 12:00 his confusion and irrationality abated somewhat.

Sometime between 11:30 and midnight trooper John Ramsey of the highway patrol arrived at the hospital. He had been to the scene of the accident and there had received from the sheriff two bottles said to have come from defendant's car. One was an empty whiskey bottle and the other was an open bottle of peppermint schnapps. Trooper Ramsey asked the doctor if he could interview the defendant, and upon receiving the doctor's permission proceeded to do so.

The defendant told the officer that he was driving the car at the time of the accident, but stated that only he and Wandgrin were in the car, and that they were going *toward* Herington, not away from it as the other evidence (and defendant's own later testimony) all indicated. He admitted drinking six or seven beers earlier that day, and some of the schnapps on the road; he denied drinking anything from the empty whiskey bottle. He also said he was driving about 60 miles per hour, couldn't negotiate a curve, and went off the road. The entire interview lasted about fifteen minutes.

At trial trooper Ramsey gave the substance of the foregoing conversation with defendant. He also testified that defendant appeared very irrational and confused, but appeared to "know what he was doing" when he signed a blood test consent form, to be discussed below. The record does not show whether Ramsey also testified, as he had on the motion to suppress, that at the time of the interview defendant "didn't appear to know where he was," that he "kept indicating to the officer that he was in jail and wanted to know if the officer could get him released," and that "it appeared to Officer Ramsey that the defendant did not know to[o] much of what happened or where he was." The oral statements elicited at that time form the basis for defendant's first claim of error.

During the interview officer Ramsey also asked the defendant if he would submit to a blood alcohol test. Defendant asked what would happen if he refused, and Ramsey told him a report would be sent to the motor vehicle department and his driver's license would be suspended. Defendant thereupon signed a consent form and a technician drew a blood sample. At trial the results, over defendant's objection, were shown to be 0.164% alcohol by weight. This is defendant's second claim of error.

As to the oral admissions, defendant first points out that he was concededly never given any type of "Miranda" warning, and contends that this failure renders his statements *ipso facto* inadmissible under *Miranda v. Arizona*, 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A. L. R. 3d 974. That case mandates such an automatic result if the statements were the product of "custodial interrogation," as defined therein:

". . . By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (Id., 384 U. S. at 444.)

In a footnote to this statement the Court observed that "This is what we meant in Escobedo when we spoke of an investigation which had focused on an accused." (The reference, of course, is to *Escobedo v. Illinois*, 378 U. S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758.)

It is true that in our case trooper Ramsey testified that at the time he talked to defendant "the focus of the investigation had narrowed down to the defendant as the operator of the vehicle in question." But this is not the same as saying that the defendant was in custody. The trooper was emphatic in his statements, each time he testified, that the defendant was not "arrested" the night of the accident and was not "in custody." In fact, he *never was* formally arrested. When the present charge was filed, two days later, a summons was mailed to defendant at his home, and he subsequently appeared in response thereto.

We have in the past recognized that *Miranda* operates in all its full glory only when the accused is in fact in some sort of police custody. *State v. Porter*, 201 Kan. 778, 443 P. 2d 360, cert den. 393 U. S. 1108, 21 L. Ed. 2d 805, 89 S. Ct. 919; *State v. Frizzell*, 207 Kan. 393, 485 P. 2d 160. We have not previously had before us the present situation, where the accused may find himself "deprived of his freedom of action," but only by reason of his physical condition and not by any action of the police. Other courts have dealt with the problem, and have reached varying results, depending largely on the particular facts.

In two cases the Alabama court found a hospitalized suspect was in custody, in one because he was being "detained" in the hospital (*Robinson v. State*, 45 Ala. App. 74, 224 So. 2d 675) and in the other because the police had taken him there and the court felt that he was not free to leave without the likelihood of police intervention (*Howard v. State*, 44 Ala. App. 595, 217 So. 2d 548).

In *State v. Ross*, 183 Neb. 1, 157 N. W. 2d 860, a participant in a shooting affray was hospitalized in shock and under sedation. The fact that he was under constant police "observation" was held to render police questioning "custodial interrogation."

In each of these cases the court found *from the factual circumstances* that the actions of the police amounted to taking the accused into custody, regardless of how the police might have characterized the situation. In each the custodial net of the police had been cast about the suspect.

Going even further, the Tennessee court has found "custodial interrogation" from the mere fact that the hospitalized person was suspected of being the driver of the death car; his freedom of activity or restraints thereof were not deemed relevant. *Vandegriff v. State*, 219 Tenn. 302, 409 S. W. 2d 370. If we read *Miranda* correctly, and especially the text and note quoted above, this is a wholly unwarranted extension of the "focusing" language of *Escobedo*. We think *Miranda* clearly says that there must be some police-instigated restraint before a suspect can be regarded as being in the custody of the officers.

The opposite tack was taken in *People v. Phinney*, 22 N. Y. 2d 288, 239 N. E. 2d 515, where the accused was interviewed in the hospital emergency room, with his father present. To be in custody, the court said, a person must be either under arrest (which the defendant was not) or in such a "coercive atmosphere" as to break down his will to resist and compel him to speak where he would not otherwise do so freely. The hospital was found to present no such coercive atmosphere.

The same approach was taken in *State v. Zucconi*, 50 N. J. 361, 235 A. 2d 193. There the driver of the fatal vehicle was interrogated both at the hospital and four days later at his home. On neither occasion, the court found, was he in custody or deprived of his freedom by the authorities. Reliance was placed on the lack of a "compelling atmosphere" and the lack of an opportunity to use the "techniques of persuasion" condemned in *Miranda*.

Similarly in *People v. Gilbert*, 8 Mich. App. 393, 154 N. W. 2d 800, a hospital admission as to operation of the death-inflicting vehicle was held admissible despite lack of "Miranda" warnings. The court there noted the *Miranda* court's emphasis on the psychological compulsion inherent in a police-dominated atmosphere, and found such an atmosphere lacking in the usual hospital setting. As

a result it refused to extend *Miranda* to what it regarded as an essentially different fact situation.

We are persuaded that these latter cases exemplify the approach we should take here. Brunner was suspected of being the driver of his car, and he was suspected of having driven while under the influence of intoxicating liquor. Officer Ramsey nevertheless did not arrest him, and we find nothing in the officer's actions which would compel a disbelief of his repeated testimony that he did not take the defendant into "custody." There is simply nothing to indicate that so far as the police were concerned he was not a free agent. His "detention," if such there was, resulted purely from medical advice. That being so, the absence of the Miranda warnings did not of itself render defendant's statements inadmissible.

It is true that the concept of "custodial interrogation" has been extended beyond the confines of the interrogator's police station. Thus in *Mathis v. United States,* 391 U. S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503, a jail inmate serving a state sentence was "in custody" for the purpose of questioning by a federal tax agent. And in *Orozco v. Texas,* 394 U. S. 324, 22 L. Ed. 2d 311, 89 S. Ct. 1095, four policemen who entered the accused's apartment at 4:00 a. m. took him into "custody" at that time. They were required to warn him of his rights before questioning, even in his own bedroom. In each of these cases it is clear that at the time of interrogation the accused was firmly enmeshed in the toils of the law, and that the restraint on his freedom of action was imposed by the forces of law enforcement. That is not the situation here.

Although the admissions were not automatically inadmissible under *Miranda,* there remains the question of whether they were "voluntary" in the light of defendant's physical and mental condition. This was in the first instance a question of fact, to be determined—as it was here—by the trial court at a separate hearing held for that purpose. *Jackson v. Denno,* 378 U. S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774, 1 A. L. R. 2d 1205; *State v. Milow,* 199 Kan. 576, 433 P. 2d 538. The trial court's determination of admissibility will be accepted by this court if it is supported by substantial competent evidence. *State v. Creekmore,* 208 Kan. 933, 495 P. 2d 96; *State v. Harden,* 206 Kan. 365, 480 P. 2d 53. The defendant's mental condition would bear on his capacity to give a voluntary statement, but is not determinative; its weight was for the trier of fact.

Here it was to be balanced against a complete absence of any other element of coercion or of any showing of involuntariness. Defendant responded freely and his statements were *prima facie* voluntary. See *State v. Harden,* supra; *State v. Kimmel,* 202 Kan. 303, 448 P. 2d 19; *State v. Hansen,* 199 Kan. 17, 427 P. 2d 627. The general rule is stated in 2 Wharton's Criminal Evidence (12th ed.) § 386:

"Evidence tending to establish that a confesser was ill or in a hysterical condition, and therefore not in full possession of his faculties at the time he confessed his guilt, does not affect the admissibility of the confession, but bears on the weight and effect to be given the confession." (pp. 119-20.)

We conclude that the trial court's finding that the defendant's statements were voluntarily made is not without support in the record.

When it comes to the blood test, however, the state's insistence that defendant was not under arrest and was not in custody impales it squarely on the other horn of a constitutional dilemma.

The leading blood test case is *Schmerber v. California,* 384 U. S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826. There the accused was arrested for driving while intoxicated and, on advice of counsel, refused to submit to the test. A blood sample was taken despite his protests and the test results used to convict him. The court, after finding no infringement of the accused's Fifth Amendment privilege against self-incrimination, went on to consider the applicability of the Fourth Amendment:

". . . It could not reasonably be argued, and indeed respondent does not argue, that the administration of the blood test in this case was free of the constraints of the Fourth Amendment. Such testing procedures plainly constitute searches of 'persons,' *and depend antecedently upon seizures of 'persons,'* within the meaning of that Amendment." (Id., 384 U. S. at 767. Emphasis added.)

The court went on to hold that the warrantless arrest of the accused was valid, having been made on probable cause, and that the subsequent "search" by way of the blood sample "was an appropriate incident to petitioner's arrest." (Id., 384 U. S. at 771.) Additional requirements which had to be met to validate the "search" were a showing of "relevance and likely success" of the test, and that the test be given in a medically safe and reasonable manner.

The Fourth Amendment implications of taking a blood sample were recently reaffirmed in *United States v. Dionisio,* —— U. S. ——, 35 L. Ed. 2d 67, 93 S. Ct. 781, 41 U. S. Law Week 4180 (January 22, 1973):

"As the Court made clear in *Schmerber, supra,* the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels—the 'seizure' of the 'person' necessary to bring him into contact with government agents, see, *Davis v. Mississippi,* 394 U. S. 721, and the subsequent search for and seizure of the evidence. In *Schmerber* we found the initial seizure of the accused justified as a lawful arrest, and the subsequent seizure of the blood sample from his body reasonable in light of the exigent circumstances."

Thus, insofar as the constitution goes, a blood sample could have been taken from the defendant Brunner even in the absence of consent—*if he had been arrested.*

Our statute, however does not go so far, although like the constitutional right to make a "search," it comes into play only when a driver is "arrested or otherwise taken into custody." Thus:

"Any person who operates a motor vehicle upon a public highway in this state shall be deemed to have given his consent to submit to a chemical test of his breath, blood, urine, or saliva for the purpose of determining the alcoholic content of his blood *whenever he shall be arrested or otherwise taken into custody* for any offense involving operating a motor vehicle under the influence of intoxicating liquor in violation of a state statute or a city ordinance *and the arresting officer* has reasonable grounds to believe that *prior to his arrest* the person was driving under the influence of intoxicating liquor." (K. S. A. [now 1972] Supp. 8-1001. Emphasis added.)

The statute goes on to say, "If the person *so arrested* refuses a request to submit to the test, *it shall not be given* and the arresting officer shall make to the vehicle department of the state highway commission a sworn report of the refusal, stating that prior to the arrest he had reasonable grounds to believe that the person was driving under the influence of intoxicating liquor." (Emphasis added.) Provisions for license suspension by the vehicle department follow, but clearly they are applicable only if the refusal is by one under arrest.

The difference, then, between the constitutional and statutory requirements is that, while both require a prior arrest, the constitution permits a compulsory test while the statute prohibits it.

In this case Brunner was not under arrest, and his refusal to submit to the blood test could not have been the basis for a suspension of his license. Yet when he asked what would happen if he refused, he was told that suspension would be the result. This, patently, was not so.

We cannot escape the conclusion that the officer's misleading advice was coercive. Had Brunner truly wished to volunteer for a blood test, he would not have asked the consequences of his refusal

before signing the consent form. We learn from *Schmerber* that coercion of this degree (and more) would have been constitutionally permissible—if there had been an arrest. If there had been an arrest, our statute would have fit perfectly into the *Schmerber* mold. Although affording immunity from forcible submission to the test, the statute provides other sanctions for refusal. But here there was no arrest, and the threat of those sanctions for refusal had no legal basis.

As we see it, Brunner was legally in the same position as any motorist who might be casually stopped by an officer and asked routinely to submit to a blood test. While such a citizen may voluntarily agree, he is free to refuse without fear of the consequences. So says the Fourth Amendment, guaranteeing the security of the people against unreasonable searches and seizures of their persons. Where consent is obtained by threat of consequences without justification in law, such consent cannot be said to be voluntary. Absent voluntary consent there is no valid waiver of an accused's Fourth Amendment rights. See *Stoner v. California*, 376 U. S. 483, 11 L. Ed. 2d 856, 84 S. Ct. 889.

The necessity for an arrest in order to justify constitutionally an incidental seizure of blood was recognized by the Pennsylvania Supreme Court in *Commonwealth v. Murray*, 441 Pa. 22, 271 A. 2d 500. There the injured driver in a vehicular homicide case was hospitalized for some thirteen days before his arrest on the pending charges. A blood test had been taken without consent and without a search warrant shortly after the accident. The court there reiterated the familiar rule that a warrantless search of an individual may be validly conducted if done as an incident to a lawful arrest, but that such search must be substantially contemporaneous with the arrest. It concluded:

". . . While the exigencies of the existing circumstances may render the search valid, even if not strictly contemporaneous with the arrest, the present situation is not such a case. Although the altruistic motives of the arresting officer in delaying the arrest are to be admired, this, in itself, cannot warrant the conclusion that the search of Murray's person thirteen days before his arrest was an 'incident' thereto." (Id., 441 Pa. at 25; 271 A. 2d at 501.)

So it is here, where there was no arrest at all to which the search could be incidental.

We recognize that a contrary result was reached in *State v. Mitchell*, 245 So. 2d 618 (Fla. 1971). The court there found no arrest necessary so long as the circumstances met the incidental

criterion of *Schmerber* that there be a clear indication of "relevance and likely success" of the blood test. The court also relied on the Florida statute in which, it noted, "The Legislature has also pointedly omitted any requirement of an arrest in connection with the administration of a blood test. . . ." (Id., 245 So. 2d at 622.) In addition to noting the difference between our statute and Florida's, we would differ with the Florida court's reading of *Schmerber*. It seems clear to us, from the language of both *Schmerber* and *Dionisio* quoted above, that an involuntary blood test search *must* depend on a constitutionally valid seizure of the suspect's person.

The result here is that Brunner's purported consent must be regarded as involuntary because coerced by the unfounded threat of suspension. The search (*i. e.*, the blood test) must therefore be tested constitutionally as a warrantless search of the person made without consent. Constitutionally it would be valid under *Schmerber* only if incidental to a valid arrest. Since there was no arrest at all, the search and its fruits must fall under the Fourth Amendment axe.

It follows that the results of the blood test were improperly admitted. The judgment is reversed and the case remanded for a new trial in accordance with the views expressed herein.

APPROVED BY THE COURT.

FROMME, J., dissenting. The two conclusions reached in the scholarly opinion of the court are inconsistent. The opinion is a prime example of what can happen when a court painstakingly attempts to follow the tangled skein of the case law declaring constitutional rights without considering the results reached.

I am disturbed and incensed by the actions of this police officer in questioning the defendant in the hospital immediately after the accident. There was no compelling reason why this interrogation could not wait until a more appropriate time. The statements were elicited from the patient, newly admitted to the hospital, who was diagnosed as suffering from acute circulatory shock, mild brain concussion and a broken hand. He was experiencing pain, was confused, was somewhat irrational, and was under a sedative. The man's statements to the officer under such conditions have little if any probative force and should be held inadmissible. Yet by following the tangled skein of constitutional case law the court arrives at the conclusion the man's irrational statements were admissible in evidence.

On the other hand a blood test must be taken promptly if the results are to have probative force. There is a compelling reason for an officer to obtain a blood sample even though a person is in the hospital. The results of a blood test are accurate regardless of the man's condition. Here again we follow the tangled skein of statutory and constitutional case law but we arrive at the opposite conclusion—the results of the blood test are inadmissible. If the written consent for the blood test was knowingly and voluntarily given the test was admissible. This was a decision for the trial court to be based upon the surrounding circumstances. The trial court concluded the consent was knowingly and voluntarily given. This court to be consistent in the opinion should hold that the record supports the trial court's determination.

The crucial testimony in the record from which the trial court determined the voluntary nature of the written consent was set forth in the testimony of the officer. The testimony of the officer is summarized as follows:

". . . he asked the defendant if he would give his written consent for a technician to draw a blood sample from him to determine the alcoholic content of his blood; that the defendant asked what would happen if he refused it and Ramsey told the defendant that if the test were refused a form would be sent to the Motor Vehicle Department, and his license could be suspended and the Defendant then said that he would sign the consent form; Ramsey advised the defendant that he didn't have to sign if he didn't want to and he didn't have to take the blood test if he didn't want to and if he did, it would probably be used against him in court; at that point, the defendant consented to the taking of blood for the purpose of the alcoholic test and did sign a written consent form; . . ."

In following the tangled skein of statutory and constitutional case law the majority arrive at the conclusion "that Brunner's purported consent must be regarded as involuntary because coerced by the unfounded threat of suspension." Thus this court has apparently adopted a *per se* rule of exclusion which removes the question of the voluntary-involuntary nature of the consent from the trial court.

As I view the testimony of the officer his statement was not coercive, it was a half-truth. It failed to advise the defendant that the law required the officer to first arrest the defendant, which he could have done on the spot, and that the officer would then renew his request for the test, which if refused would eventually result in suspension of license. I can see no apparent attempt by the officer to mislead the defendant. This half-truth does not in my opinion amount to coercion *per se*.

I would arrive at opposite conclusions from those of the majority. The record on appeal in my opinion conclusively shows the statements of the defendant were not knowingly and voluntarily made. They should be held inadmissible. The results of the blood test were properly determined to be admissible by the trial court. Therefore I respectfully dissent.