**INDIANA & MICHIGAN ELECTRIC COMPANY, an Indiana corporation, Plaintiff-Appellant,**

v.

**Leon A. POUNDS, Juanita S. Pounds, Defendants-Appellees.**

**No. 1–1180A323.**

Court of Appeals of Indiana, Fourth District.

Sept. 15, 1981.

Rehearing Denied Nov. 30, 1981.
See 428 N.E.2d 108.

Thomas W. Yoder, Grant F. Shipley, Livingston, Dildine, Haynie & Yoder, Fort Wayne, for plaintiff-appellant.

Jack R. Robinson, Rockport, John R. Werner, Cannelton, for defendants-appellees.

CHIPMAN, Presiding Judge.

Indiana & Michigan Electric Company (I & M) is appealing an adverse judgment for damages awarded in a Dubois Circuit Court jury trial. Leon and Juanita Pounds received $40,000 plus interest for their six acres of rural property in an eminent domain action. I & M contends it did not receive a fair hearing because the trial court arbitrarily frustrated its attempts to discover and present evidence on the fair market value of the property.

We agree and find the judgment should be reversed and a new trial ordered.

Our finding rests largely on the trial court's manner of disposing with I & M's attempts to obtain and present significant evidence. While we normally give great deference to the trial court's discretion in handling matters of evidence, when in our opinion we find the court's decisions are based on procedures and grounds so inappropriate as to be arbitrary and prejudicial, we must reverse in the interest of substantial fairness.

## I. ISSUES

Three issues raised by the parties are of immediate concern. We restate those issues as follows.

1) Whether it was an abuse of discretion for the trial court to refuse to enforce discovery without a showing the information sought would not lead to admissible evidence.

2) Whether it was an abuse of discretion to suppress evidence on the basis of a motion in limine without a showing of prejudice.

3) Whether it was an abuse of discretion to suppress evidence of scientific tests because they did not conform precisely to administrative procedure.

## II. DISCOVERY

I & M attempted to depose the Pounds concerning the value of their land condemned effective August 5, 1977, for a power plant's coal storage area. At the deposition the Pounds admitted purchasing the property on October 1, 1973, from Russell Hack but refused to disclose the purchase price or to comply with a subpoena duces tecum for documents related to the sales price. I & M filed a motion to compel discovery. The Pounds, without responding to the motion to compel, filed a motion in limine seeking a protective order to prevent the jury from learning of the earlier sale or sales price. To support its motion in limine, the Pounds submitted an affidavit signed by Hack stating in pertinent part:

"2. That one of the reasons that he sold the real estate to Mr. & Mrs. Pounds was because of rumors and newspaper stories that Indiana & Michigan Electric Company, Inc. was considering building a power plant in the area and he believed that his property, because of these rumors and stories, was decreasing in value and would further decrease in value in the future if a power plant were built."

The trial court denied the motion to compel and granted the motion in limine. I & M filed a motion to reconsider and submitted a counter-affidavit challenging Hack's credibility. The trial court overruled the motion without a hearing and proceeded directly to trial.

As a result, I & M was denied discovery and use of a recent prior purchase price,

often the best and most relevant evidence of fair market value. *State v. Valley Development Co.*, (1971) 256 Ind. 278, 268 N.E.2d 73. The use of a motion in limine as a means to exclude prejudicial questions and statements at a jury trial is an established part of Indiana practice. *Burrus v. Silhavy*, (1973) 155 Ind.App. 558, 293 N.E.2d 794. Its use to block discovery, however, is unusual and misplaced.

The purpose of the motion in limine is to prevent prejudicial questions and statements in the presence of the jury and we have restricted its use to those situations. *Baldwin v. Inter City Contractors Service, Inc.*, (1973) 156 Ind.App. 497, 297 N.E.2d 831. It is the prejudicial effect of the questions asked or statements made in connection with the offer of the evidence, not the prejudicial effect of the evidence itself, which the motion is intended to reach. *Burrus v. Silhavy, supra* (quoting with approval from *Bridges v. City of Richardson*, (1962) 163 Tex. 292, 354 S.W.2d 366). The motion in limine has no place or use in discovery.

Under Trial Rule 26(B) discovery may reach any unprivileged material which is relevant to the subject matter or reasonably calculated to lead to admissible evidence. In this case the only assertion the subject matter was irrelevant came as part of a motion in limine.

In this awkward procedural posture of non-responsive motions, it is impossible for us to devine on what basis the trial court denied discovery. Since a motion in limine is designed to protect the moving party from the possible prejudicial effect of in-court statements before the jury, we cannot assume that by sustaining the motion in limine, the trial court believed the purchase price irrelevant or unlikely to lead to admissible information and consequently beyond the scope of discovery.

Since there is no discernible basis for denying discovery, the trial court by doing so committed an error which gravely handicapped the plaintiff in its pursuit of evidence.

### III.  MOTION IN LIMINE

Trial Rule 43(E) permits motions to be decided on the basis of affidavits presented by the parties.  The rule follows a long-time policy of permitting ex parte affidavits to be received as evidence in interlocutory or preliminary matters, although they would be but hearsay at trial.  *In Re Hadley*, (1921) 191 Ind. 104, 132 N.E. 255; *Ohio & M. Ry. Co. v. Levy*, (1892) 134 Ind. 343, 32 N.E. 815, *aff'd on rehearing*, 34 N.E. 20.  In preliminary motions, the usual system of evidentiary rules is often ignored, partly because of the subsidiary and provisional nature of the inquiry, but chiefly because there is no jury, and the rules of evidence are, as rules, traditionally associated with a trial by jury.  6 J. Wigmore, Evidence § 4, § 1709 (1976).  The courts have not been greatly concerned by this practice because the danger inherent in the lack of an opportunity to cross-examine is molified by the proven good sense of trial judges and by fairly straightforward rules of procedure.  However, motions and accompanying affidavits affecting critical issues of a case deserve scrutiny when a decision on a motion may well determine the outcome of the trial.

The motion offered in this case was a motion in limine supported by an affidavit from the original owner, Russell Hack, stating simply he sold the land because of rumors about I & M's plans and his fears that his property value would decrease.

While rumors of the I & M project may have been the catalyst for Hack's decision to sell, the affidavit does not contend I & M's project had any effect whatsoever on the sales price.  Hack, significantly, does not allege he was forced to sacrifice the property nor does he indicate he obtained something other than the fair market value.  The Pounds likewise remain entirely silent about the price, except to assert it is irrelevant and prejudicial, but the mere assertion is not evidence of the fact, see *Irwin v. State*, (1942) 220 Ind. 228, 41 N.E.2d 809,

nor is an affidavit probative evidence when it fails to address the issue for which it is offered as support.

We agree with the Pounds that an increase or decrease in a property's market value, which is brought about by the project for which the property is being condemned, may not be considered in determining the fair value of the property.  *State v. Sovich*, (1969) 253 Ind. 224, 252 N.E.2d 582.  However, the Pounds have attempted here to use the pre-trial motion in limine as a vehicle to suppress the prior sales price as irrelevant.  The purpose of the motion in limine is to exclude prejudicial matter, not to exclude irrelevant evidence.  *Baldwin, supra* 156 Ind.App. at 497, 297 N.E.2d at 832.  In this case not only do they use the wrong vehicle, but they ask the court to make the exclusion without knowing the substance of what is being excluded and to do so on the strength of an affidavit which does not clearly show any effect on the sales price.  The net result has been to eliminate evidence of the highest order without serious argument or factual support for the exclusion.  We consider the matter much too important for such cursory treatment.

### IV.  SCIENTIFIC TESTS

In addition to the pre-trial problems, efforts by I & M to introduce evidence at trial of soil conditions also were uncritically dismissed.  I & M offered the results of percolation tests to counter testimony the property's highest and best use was for industrial development.  The test results would have shown the property was waterlogged, a factor which could be expected to have a dramatic effect on the property's value.  Objection to the admission of those test results was sustained because the test did not correspond to State Board of Health procedures.  The trial court accepted the defendants' argument that unless the tests were conducted precisely according to the procedures provided at 410 IAC 6–8–10,[1] the evidence was inadmissible.

---

1.  410 IAC 6–8–10 Percolation test procedure
    The procedure for conducting the percolation test is as follows:

(A) Dig or bore holes with horizontal dimensions of from 4 to 12 inches and vertical sides to the estimated depth of the bottom of the

The record indicates the only lack of correspondence between the regulatory procedure and I & M's procedure was that the test holes were checked each hour by I & M while the regulation required checks every 15 minutes. I & M offered to prove the test results showed essentially no absorption of water at all and consequently a 15-minute

proposed absorption trench. In order to save time, labor and volume of water required per test, the holes may be bored with a 4-inch auger.

(B) Scratch the bottom and sides of the hole with a knife blade or sharp pointed instrument in order to remove any smeared soil surfaces and to provide a natural soil interface into which water may percolate. Remove all loose soil from the hole. Place about 2 inches of clean coarse sand or fine gravel in the bottom of the hole.

(C) Carefully fill the hole with clear water. By refilling if necessary, keep the hole full of water for at least 12 hours. This saturation procedure will give most soils ample time to swell and approach the conditions that prevail during the wetter seasons of the year.

(D) After the 12-hour saturation period, allow the water in the hole to seep away completely. Remove that portion of the sand or gravel which has become coated with soil particles.

(E) Pour about 12 inches of water into the hole and wait until about 6 inches of this water remains.

(F) With about 6 inches of water remaining in the hole, establish a reference point by use of a nail stuck in the side of the hole near the top of the hole. From this point obtain a measurement to the top of the water level. Record the measurement and the exact time.

(G) Continue the measurement to the top of the water surface for a period of at least three hours and time recording at 15-minute intervals until at least three consecutive readings of approximately the same rates of percolation are obtained. It may be necessary to add another 6 inches of water more than once to obtain the consecutive same-rate readings.

(H) Convert the final time interval obtained in "G" above to minutes and divide this figure by the number of inches of water which has seeped away in that interval to obtain the time for one inch of water to seep away. The system design should be based on the percolation rate of the slowest hole on the proposed site.

(I) Determine from Table IV the square feet of trench bottom area needed for each bedroom. See Table V for width and spacing of absorption trenches.

(J) Multiply the square feet of trench bottom absorption area needed for each bedroom by the number of bedrooms in the house to get the total trench bottom area needed.

TABLE IV

DATA FOR DETERMINING SQUARE FEET OF ABSORPTION AREA NEEDED
PER BEDROOM FOR ABSORPTION TRENCHES

| Time in Minutes for Water to Fall One Inch | Effective Absorption Area in Square Feet Needed in Trench Bottom per Bedroom |
| --- | --- |
| 3 minutes or less per inch | 100 sq. ft. per bedroom |
| 4 minutes per inch | 115 sq. ft. per bedroom |
| 5 minutes per inch | 125 sq. ft. per bedroom |
| 10 minutes per inch | 165 sq. ft. per bedroom |
| 15 minutes per inch | 190 sq. ft. per bedroom |
| 30 minutes per inch | 250 sq. ft. per bedroom |
| 60 minutes per inch | 330 sq. ft. per bedroom |
| Over 60 minutes | Unsuitable for absorption field |

TABLE V

SIZE REQUIREMENTS FOR ABSORPTION TRENCHES

| Width of Trench at Bottom in Inches | Depth of Trench in Inches | Effective Absorption Area in Square Feet per Linear Foot |
| --- | --- | --- |
| 18 | 18 to 30 | 1.5 |
| 24 | 18 to 30 | 2.0 |
| 30 | 18 to 36 | 2.5 |
| 36 | 24 to 36 | 3.0 |

check would have served no purpose nor would have provided any additional information material to the ability of the soil to absorb water.

■ The proposition that a variation from a testing procedure automatically makes the results of tests inadmissible as evidence is sound only when the procedure necessarily controls the reliability of the test results. We see no reason for rejecting evidence adduced by scientific testing simply because of an immaterial procedural variance. The persuasiveness of evidence produced by such a test is, in a large measure, dependent upon the expertise of the witness who conducted it, which in the final analysis is to be determined by the jury, after an opportunity of careful cross-examination. *Reid v. State*, (1972) Ind., 372 N.E.2d 1149 at 1152; *see People v. Adams*, (1976) 59 Cal.App.3d 559, 131 Cal.Rptr. 190.

■ The regulation upon which this objection was sustained governs testing procedures for determining the suitability of soil for residential septic disposal systems. It does not control the reliability of percolation tests offered for other purposes—such as an evidentiary demonstration of soil saturation. The issue here is not the denial of a residential septic system, but the value of property zoned for industrial use. I & M's tests would have provided the same results and indicated the same conclusions however often the holes were examined. Zero water absorption after an hour is as reliable an indicator of wet soil as a rate of zero absorption per 15 minutes over a span of an hour. The uncritical reliance on tangential administrative regulations should not replace common sense in a determination of what evidence is admissible.

Although other I & M witnesses testified the land was in a "flood plain" and consisted of a type of soil that was "tight" and "severe" and would tend to be "wet," only the percolation tests demonstrated the actual severity of the soil condition on the six acres. It is one thing to be technically in a flood plain but quite another to be actually waterlogged. The exclusion seriously limited the jury's supply of pertinent and important information necessary in evaluating the fair market value of the site.

## V. CONCLUSION

The unfortunate result of the evidentiary decisions in this case is that the jury was denied the best evidence of the property's fair market value for reasons that do not withstand even cursory inspection. The prior sales price was disposed of by a pre-trial affidavit which failed to address the critical question and the saturated soil condition was disposed of on the basis of a State Board of Health timing procedure which bears no relationship to the critical question of scientific reliability of evidence.

We cannot say these errors were harmless, particularly since the other evidence presented to the jury concerning the highest and best use of the land amounted to little more than the oathsaying of a string of experts.

We reverse and remand for a new trial.

MILLER and YOUNG, JJ., concur.