**Clyde ORR, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 2–283A56.

Court of Appeals of Indiana, Second District.

Dec. 27, 1984.

James H. Voyles, Ober, Symmes, Cardwell, Voyles & Zahn, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Theodore E. Hansen, Deputy Atty. Gen., Indianapolis, for appellee.

MILLER, Presiding Judge of the Fourth District (Sitting by Designation).

Defendant-appellant Clyde Orr, appeals his conviction on two counts of Operating a Motor Vehicle while Intoxicated Resulting in the Death of Another Person. On appeal he challenges

1. the admissibility of the results of a laboratory analysis of blood taken from him at the hospital after the accident,

2. the trial court's refusal to give two of his proposed jury instructions,

3. the admissibility of statements made by him to police officers at the scene of the accident and at the hospital, and

4. the sufficiency of the evidence to sustain his conviction.

We find no error and affirm the trial court.

### FACTS

Shortly before 1:00 A.M. on August 23, 1981, Clyde Orr was driving his yellow Cadillac west on U.S. Highway 40 on the west side of Indianapolis. He pulled into the left lane of the four-lane highway to pass a slower moving vehicle. As he passed the vehicle and began to pull back into the right lane, he suddenly came upon a slow moving truck which he had apparently not seen. Orr's Cadillac then cut sharply to the left, crossing over into the two oncoming lanes and striking head-on, a green Ford in which the decedents were traveling eastbound in the far lane of the road. Two teenage couples were in the car that was struck by Orr. The passengers in the back seat, Doug Cohen and Tammy Samuels, were seriously injured, while the two in the front seat, Kimberly Kent and Rickey Jessee died as a result of the collision.

The investigating officer on the scene, Marion County Deputy Sheriff Bonnie Goff found Orr pinned on the front floor of his car. She testified that he smelled of alcohol and she believed him to be intoxicated. She also testified that he appeared to be injured and was yelling and swearing at the people trying to help him.

Orr was taken by ambulance to the Methodist Hospital Emergency Room. After concluding her duties at the scene of the collision, Officer Goff went to the hospital to continue her investigation of the accident. She attempted to talk to Orr about the accident, but he was screaming that he wanted to get out of the hospital and did not want to talk to anyone. Eventually, he did answer some of her questions and admitted he had been drinking at the Crafty Cockney's and the Picadilly Lounge. Orr was never placed under any restraint or under arrest.

Orr was treated by Dr. Robert Weller, the attending physician in the emergency room that morning. Dr. Weller ordered a blood-alcohol test on Orr's blood. Two samples of Orr's blood were taken to the emergency room laboratory at approximately 2:45 A.M. and 2:50 A.M. by Jean Richmond, a staff nurse at the hospital.

Naomi Carey, a lab technician at Methodist Hospital received a blood sample labeled Clyde Orr at approximately 3:00 A.M. She performed the blood-alcohol test on Orr's

blood the results of which showed .19% by weight of alcohol in his blood.

Orr was indicted by a grand jury on December 8, 1981 being charged with two counts of Operating a Motor Vehicle While Intoxicated Resulting in the Death of Another Person, two counts of Reckless Homicide, two counts of Involuntary Manslaughter, and two counts of Battery. He was tried by jury commencing on October 11, 1982 and at the close of State's case the court granted Orr a judgment on the evidence as to the two counts of Battery.

On October 15, 1982, the jury returned guilty verdicts as to the remaining counts. On December 3, 1982 the trial court entered judgments of conviction for the two counts of driving while intoxicated resulting in the death of another person, as the remaining counts were covered in these charges. Orr was sentenced to imprisonment for a period of five years with three years suspended on each count, sentences to run concurrently.

### DECISION

*Admissibility of the Results of the Laboratory Analysis of Blood Taken from Orr at the Hospital*

Orr's initial contention is that the State failed to establish a proper foundation for admitting the results of the blood alcohol because:

1. the chain of custody of the blood sample did not adequately establish that the laboratory analysis performed by Naomi Carey was carried out with Orr's blood, and

2. the analysis of the blood sample was performed in a scientifically unreliable manner.

*(1) Chain of Custody*

The first prong of Orr's challenge to the adequacy of the foundation concerns the proper identification and chain of custody of the blood sample. The thrust of Orr's argument is that the blood test results were not adequately identified as being those which derived from his blood sample because of a combination of two "facts":

(1) the State did not show that the blood test results were not those of another individual with the same last name, and (2) his hospital patient number was not printed on the requisition form which accompanied the labeled vial containing his blood sample. Orr also urges that the State's inability to account for every person through whose hands the sample passed between the emergency room and the chemistry lab is fatal to a proper chain of custody.

The admissibility of fungible evidence such as blood samples depends upon a foundation which establishes, *inter alia,* a continuous chain of custody. The purpose of the rule requiring the State to show a continuous chain of custody of fungible evidence is to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence. *Arnold v. State,* (1982) Ind., 436 N.E.2d 288, 291 citing *Bruce v. State,* (1978) 268 Ind. 180, 375 N.E.2d 1042, *cert. denied* 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662. When fungible evidence is subjected to analysis or testing, it is incumbent upon the State to present evidence of the doctor or someone in authority who was present at the time of the taking of the specimen and to further demonstrate a chain of custody of the specimen to the lab where the testing was made and the conclusions drawn. *Rinard v. State,* (1976) 256 Ind. 56, 351 N.E.2d 20. However, it is not necessary to account for every minute or every hand through which the sample passes. A proper showing requires only the production of evidence from which the trial court may reasonably conclude that the specimen passed through time and various hands in a relatively undisturbed fashion to the point where it is subjected to analysis. *Fendley v. Ford,* (1984) Ind.App., 458 N.E.2d 1167; *Orr v. Econo-Car of Indianapolis, Inc.,* (1971) 150 Ind.App. 411, 276 N.E.2d 524.

The record reveals that shortly after Orr was admitted to the Methodist Hospital emergency room on the morning of August 23, 1981, Dr. Weller, the treating physician, ordered a blood alcohol test to be

performed on Orr's blood. The emergency room logbook containing the entries for the blood samples which were drawn that morning shows two entries for Orr—one at 2:45 A.M. under the name of "Orr," and one at 2:50 A.M. under the name of "Clyde Orr." Each of these entries had been initialed by Jean Richmond, the supervising nurse in the emergency room that morning, who, at the suppression hearing and at trial, identified the initials and handwriting as her own.

Richmond testified that Orr had been placed in Room 15 of the emergency area which was under her care and supervision. She stated that she was present when Orr's blood samples had been drawn, although she did not recall whether she had personally drawn the samples, or whether another nurse working in the same area had drawn the samples. Richmond explained that the blood is drawn and injected into presealed sterilized vials and that the vials, containing permanent non-removable labels, are then marked with the patient's name and hospital number. The vials are then taken to the emergency room laboratory where they are transported to a designated location for analysis. Richmond testified that it was customary to draw at least two vials of blood when any kind of blood work was to be performed.

Naomi Carey, the laboratory technician who performed the blood alcohol test on Orr's blood sample, testified that on the morning of August 23, 1981, she was in the chemistry lab performing toxicology tests. She stated that she received three blood samples from the emergency room laboratory at 3:00 A.M., each of which was to be tested for its alcohol content. The vials containing the samples from the emergency room lab were each sealed and bore non-removable labels with the name and hospital number of the patient from whom they were drawn. The vials she received were the samples of Clyde Orr, Doug Cohen, and John Doe. As was her practice, Carey made an entry in the chemistry lab logbook for each of the samples received. The entry for each included the patient's name, the time the sample arrived in the chemistry lab, the type of test to be performed, the name of the treating physician who ordered the test, the location from which the samples had been sent, and a notation denoting that the requisition was on a back-up handwritten form rather than the customary computer printout. The back-up requisition form was always used in the early morning hours when the Methodist Hospital computer was down and inoperative.

Testimony was elicited from Carey, as well as Nurse Richmond and Dr. Walter Frajola, Orr's medical expert, regarding the significance of the hospital patient number. Each stated that the number was of crucial importance for purposes of accurate identification and correlation of laboratory work with the patients for whom such services were performed. Furthermore, Carey, Richmond, and Frajola each testified that without the hospital number of the patient, one could not be absolutely certain that samples upon which analyses and tests were performed were in fact those of the patient whose name appeared on the sample's label.

Orr argues that because there were two entries in the emergency room blood sample logbook,—one for "Orr" and one for "Clyde Orr,"—there must have been two individuals with the same last name whose blood samples had been drawn within five minutes of each other in the Methodist Hospital emergency room that morning. Thus, Orr contends, the possibility that blood was drawn from two different Orrs in the emergency room, when combined with the absence of his hospital patient number on the back-up requisition form is sufficient to cast substantial doubt upon whether the blood alcohol test which Carey conducted was, in fact, of his blood. Therefore, he urges, the test results should not have been admitted. He further points to the State's inability to identify the hospital personnel who transported the blood sample from the emergency room laboratory to the chemistry lab as fatal to a continuing chain of custody.

The record contains sufficient evidence to rebut each of these contentions. Dr. Weller, the physician who had treated Orr and ordered the blood-alcohol test, testified that there was only one Orr in the emergency room that morning—Clyde Orr. Nurse Richmond testified that she had no recollection that there had been two individuals with the same last name of Orr in the emergency room, and that had there been two Orrs, she would have recalled that fact and the emergency room log entries would have reflected as much. She also testified that occasionally, when she was rushed, she entered only last names in the log if the full name was entered nearby. And, as stated previously, Carey testified that the blood sample she received was labeled with *Clyde* Orr's name and hospital number. Moreover, there is testimony of record which explains the absence of Orr's hospital patient number on the exhibit he introduced at trial. Carey testified that the back-up requisition form she received in the lab did, in fact, state Clyde Orr's hospital number. She stated that she would not, nor did she ever, perform laboratory analyses unless the requisition form and sample labels stated the patient's hospital number. She further explained that she customarily signed or initialed the requisition forms when her analyses were completed. Although the requisition form introduced by Orr bore Carey's initials, Carey stated that she had not initialed the form which was in evidence, nor were the initials in her handwriting. When asked how she might account for this anomaly, Carey explained that temporary handwritten back-up requisition forms were only used for a short period of time each day in the early morning hours when the computer was inoperative. When the computers were again working, the information on the back-up requisitions was routinely fed into the computer and the handwritten forms were routinely destroyed. She stated that the form which Orr had obtained from the hospital was merely a facsimile of the original—one which contained an obvious omission: Orr's hospital number. Except for the allegedly missing hospital patient number on the requisition form, all other information necessary to the identification of the patient and the sample was complete. Under these facts, the evidence was sufficient to establish that the blood sample Carey tested was that of Clyde Orr.

■ With respect to the chain of custody, it was not necessary for the State to produce or identify the hospital personnel who transported the sealed and labeled vial containing Orr's blood sample from the emergency room laboratory to the chemistry laboratory. The law does not require that the proponent account for "every hand through which the sample passes." *Fendley v. Ford, supra,* 458 N.E.2d at 1169. The chain of custody is established if the court may reasonably conclude from the evidence that the specimen passed through time and various hands in a relatively undisturbed fashion to the point where it is subjected to analysis. *Id.* The record reveals that the time which lapsed between the taking of the sample in the emergency room and the receipt of the sample in the chemistry lab was, at most, fifteen minutes. Nurse Richmond testified that she was present when the blood was drawn and injected into the presealed vial. Carey received the vial—seal unbroken—a few minutes later in the chemistry lab. There is no evidence of tampering, mistake, or contamination. Therefore, the evidence here clearly established a proper chain of custody.

*(2) Manner in Which Blood Test Was Conducted*

■ The second prong of Orr's challenge to the admissibility of the blood test results is the accuracy of the testing procedures employed by Carey, the lab technician.

There appears to be no dispute between the parties that the determination of the presence of alcohol in the blood is a proper area for expert testimony since the methods used in this determination are outside the knowledge of the average juror. Carey, who performed the actual analysis of Orr's blood was eminently qualified in this area. She had an undergraduate degree in Chemistry and Mathematics and had done

graduate work in the same areas at Indiana University. Carey received her training at Methodist Hospital, was a Registered Chemist with the American Society of Clinical Pathologists, and had been employed as a technician in the chemistry lab at Methodist Hospital for 31 years. Her duties in the chemistry lab included performing various kinds of blood tests, not infrequently blood-alcohol tests. She generally performed eight to ten blood tests per night.

Carey performed blood-alcohol tests through the use of highly sophisticated instrument known as the gas chromatograph. The gas chromatograph runs at a high temperature and separates the different elements in the blood. The elements emerge in gaseous form at different time intervals and are plotted on a graph in a series of peaks.

A blood-alcohol test is conducted by comparing a blood sample (testing sample) with a control sample. A control sample is pure blood that is injected with known amounts of alcohol. The control sample is run through the gas chromatograph and gives meaning to the peaks on the graph paper because the amounts of alcohol were previously ascertained. The testing sample is then run through so that the results may be compared. By careful analysis a technician can arrive at a percentage figure of the amount of alcohol present in the blood.

Carey testified that she obtained a sample from the hemotology lab to be used as a control. She smelled the sample to see if she was able to detect any alcohol. Carey then proceeded to test the control and the sample of Orr's blood on the gas chromatograph. She testified that her analysis of Clyde Orr's blood sample revealed it contained .19 percent alcohol.

Orr challenges the admissibility of the results of the blood test contending that Carey did not utilize an adequate control sample. Orr's expert witness, Dr. Walter Frajola, who was also a highly qualified chemist from Ohio, testified that in his opinion the test conducted by Carey was unreliable because her "sniff test" of the control sample was inadequate. He testified the control sample should contain *no* alcohol for the gas chromatograph to be accurate. Frajola's opinion was that scientific testing must be done to the control sample to determine that it was indeed pure blood, otherwise the entire test is called into question. The issue confronting us therefore is whether the contradictory evidence assailing the reliability of Carey's testing procedures renders the test results inadmissible. We believe that mere contradiction of a recognized expert's method of conducting a scientifically acceptable test is not fatal to admissibility.

There is no dispute as to Carey's qualifications as an expert. Carey testified that, she had been a lab technician at Methodist for 31 years, she performed eight to ten blood tests per night, and in analyzing Orr's blood, she obtained a control sample that she believed to be sufficiently pure to provide adequate testing. The reasonable inference from her testimony is that as an experienced technician she was satisfied her work was properly conducted.

Frajola, while acknowledging that the gas chromatograph is a very acceptable method for measuring alcohol content, is of the opinion that Carey's utilization of the chromatograph did not ensure a reliable test. In sum, there is a disagreement as to what is the proper procedure for conducting such a test. When presented with an analogous situation involving the propriety of soil testing procedures, Judge Chipman stated:

"The proposition that a variation from a testing procedure automatically makes the results of tests inadmissible as evidence is sound only when the procedure necessarily controls the reliability of the test results. We see no reason for rejecting evidence adduced by scientific testing simply because of an immaterial procedural variance. The persuasiveness of evidence produced by such a test is, in a large measure, dependent upon the expertise of the witness who conducted it, which in the final analysis is to be determined by the jury, after an opportunity

of careful cross-examination." (Citations omitted). *Indiana & Michigan Electric Co. v. Pounds,* (1981) Ind.App., 426 N.E.2d 45 at 50.

Our supreme court has also recognized that conflicting opinions between experts as to the validity of testing procedures is best handled through cross-examination, with the final analysis left to the jury. *Martin v. Roberts,* (1984) Ind., 464 N.E.2d 896 (analysis of dune buggy accident); *Jones v. State,* (1981) Ind., 425 N.E.2d 128 (neutron activation analysis to establish similarity of bullets); *Reid v. State,* (1978) 267 Ind. 555, 372 N.E.2d 1149 (trace metal detector test).

In *Martin, supra,* which involved a dune buggy accident, the trial court qualified a state trooper as an expert witness and permitted him to testify as to the speed of the vehicle. The court of appeals held that the trial court abused its discretion by permitting the trooper to testify as an expert about his opinion as to the speed of the vehicle because, although he had training and expertise in accident analysis, he "failed to offer the necessary evidence of his expertise in or with a formula, calculation or principle." *Martin v. Roberts,* (1983) Ind.App., 452 N.E.2d 182 at 187. The supreme court determined that the court of appeals erred and it was within the trial court's discretion to allow the trooper to testify. The court held that, once he was qualified as an expert, his testimony did not have to encompass all scientific factors that might have gone into the formulation of his opinion. The court concluded that these factors go to the weight of the testimony rather than its admissibility, stating:

"There are doubtless many formulas and principles which experts use in this field or any other to arrive at their ultimate opinions. The determination of which factors, formulas or calculations are necessary, either singly or in conjunction with each other, to form an expert opinion is within the knowledge and judgment of the expert and, again, is a subject which can be approached and examined in the cross-examination or by bringing forward other expert witnesses."

*Martin, supra,* 464 N.E.2d at 900.

The *Martin* reasoning is applicable to the case at bar. Certainly, the reasonable inference from Carey's testimony is that, based on her extensive experience, she believed her results to be accurate. *Martin* establishes that she does not have to testify to the validity of every step that went into the formulation of her results as a foundation for their admissibility.

Additionally, the challenge to Carey's procedures was not overly compelling so as to indicate that the blood-alcohol test was done improperly. Dr. Frajola acknowledged on cross-examination that in the 98 cases in which he has testified (most of them blood-alcohol cases in Indiana and Ohio), he disagreed with the technicians who performed the tests 100% of the time. The reasonable inference from this testimony is that perhaps he is the lone dissenter and is departing from what is generally accepted procedure by a substantial number of medical technicians in the two state area of Indiana and Ohio. Consequently, his challenge should go to the weight, not the admissibility, of the test results. *Martin, supra.*

Finally, Orr does not argue that he was denied the opportunity to cross-examine Carey with respect to her methods. The fact is that he did not even attempt to exploit this issue. He merely relied on contradictory testimony by his own witness. This case presents a strong example of the viability of the rule in *Martin.* We are left with a mere contradiction although Orr had ample opportunity through cross-examination to expose any defect which might have affected credibility or admissibility.[1]

---

1. In *Southern Indiana Gas & Electric Co. v. Gerhardt,* (1961) 241 Ind. 389, 172 N.E.2d 204, an eminent domain case, an expert witness gave his estimate of damages for an easement taken by the utility. On cross-examination he revealed his estimate of damages was based on his understanding that the landowner could not cross the strip of land in question. The su-

*Trial Court's Refusal of Orr's Tendered Final Instructions Numbers 5 and 8*

▪ Orr further contends the trial court erred in refusing to offer his tendered final instructions 5 and 8. Instruction Number 5 read as follows:

"The guilt of the accused is not to be inferred because the facts proven may be consistent with this guilt, but, on the contrary, before there can be a verdict of guilty, you must believe from all the evidence and beyond a reasonable doubt that the facts proven are inconsistent with his innocence. If two conclusions can be reasonably drawn from the evidence, one of innocence and one of guilt, you should adopt the one of innocence."

Instruction Number 8 read as follows:

"You are instructed that there was, in force and effect, on August 23, 1981, the following statute which reads, in part, as follows:

(a) On every bus or truck whatever its size there shall be the following: on the rear two reflectors, one at each side and one stop light.

(b) On every bus or truck 80 inches or more in overall width, in addition to the requirements in paragraph (a); on the front, two clearance lamps, one at each side.

(c) On each side two side marker lamps, one at each side.

(d) On each side two side marker lamps one at or near the front end and one at or near the rear.

(e) On each side two reflectors one at or near the front and one at or near the rear."

▪ It is not error to refuse to give an instruction when the subject matter of that instruction is adequately covered by other instructions adequately given. *Short v. State*, (1982) Ind., 443 N.E.2d 298; *Daniels v. State*, (1980) 274 Ind. 29, 408 N.E.2d 1244. The substance of defendant's tendered instruction Number 5 was adequately covered by the trial court's Preliminary Instruction Number 6, which was re-read as a final instruction, and Final Instruction Number 13.[2]

▪ A trial court should not give an instruction which is not relevant to the issues the jury must decide in reaching its verdict. *Perdue v. State*, (1979) Ind.App., 398 N.E.2d 1290. Orr's Instruction Number 8 quotes a portion of a statute pertaining to the required lighting equipment of buses and trucks. He is apparently suggesting that the jury might have determined the cause of the accident was the failure of the truck to display lights and not his intoxication. We would point out

preme court held that his testimony was based on a false and inaccurate assumption and the trial court erred in refusing to strike his estimate of damages. Returning to our present case, had Orr taken the opportunity to cross-examine Carey, he may have uncovered evidence affecting admissibility. Instead he chose another course—to rely on a bare contradiction by another expert witness. Such was not enough to render Carey's otherwise competent testimony inadmissible.

2. Preliminary Instruction Number 6 read as follows:

" 'Reasonable doubt' as referred to herein is a fair, actual and logical doubt that arises in your mind after an impartial consideration of all the evidence and circumstances in the case. It should be doubt based upon reason and common sense and not a doubt based upon imagination or speculation.

If, after considering all of the evidence, you have reached such a firm belief in the guilt of the defendant that you would feel safe to act upon that conviction, without hesitation, in a matter of the highest concern and importance to you, when you are not required to act at all, then you will have reached that degree of certainty which excludes reasonable doubt and authorizes conviction.

The rule of law which requires proof of guilt beyond a reasonable doubt applies to each juror individually. Each of you must refuse to vote for conviction unless you are convinced beyond a reasonable doubt of the defendant's guilt, and your verdict must be unanimous."

Final Instruction Number 13 read as follows:

"If, after considering all of the evidence, the argument of counsel, and the instructions given you by the court, you have any reasonable doubt of the guilt of the defendant as charged in, or covered by the (indictment), you should acquit even if you find the accused was guilty of misbehavior or of other crimes which are not charged or covered."

that not only must a tendered instruction be a correct statement of law, there must also be evidence in the record to support the giving of the instruction. *Richey v. State,* (1981) Ind., 426 N.E.2d 389.

There was no testimony as to the size of the truck or the placement of the side lights on the truck. One witness testified that he had no problem viewing the tail lights of the truck and another described them as "two big round tail lights." Orr has not pointed to any testimony that would warrant this instruction. *Richey, supra.* The trial court did not err in refusing Orr's tendered instructions.

*Admissibility of Statements Made by Orr at the Scene of the Accident and at the Hospital*

Orr contends that any statements made by him to police officers at the scene of the accident or at the hospital are inadmissible because he was not advised of his constitutional rights as required by *Miranda v. Arizona,* (1966) 384 U.S. 436, 486, 86 S.Ct. 1602, 1634, 16 L.Ed.2d 694. The State argues *Miranda* only applies to custodial interrogation and is inapplicable here as Orr was never in custody.

The procedural safeguards of *Miranda* apply only to "custodial interrogation." *Minneman v. State,* (1982) Ind., 441 N.E.2d 673, *cert. denied* 461 U.S. 933, 103 S.Ct. 2099, 77 L.Ed.2d 307; *Lucas v. State,* (1980) 274 Ind. 635, 413 N.E.2d 578. While a suspect need not be in actual custody before prescribed warnings must be given, *U.S. v. Lackey,* (7th Cir.1969) 413 F.2d 655, *Miranda* requirements are not applicable to general on the scene investigation in a noncoercive atmosphere. *Miranda, supra; Hatcher v. State,* (1980) 274 Ind. 230, 410 N.E.2d 1187; *Dillon v. State,* (1971) 257 Ind. 412, 275 N.E.2d 312; *Stallings v. State,* (1970) 255 Ind. 365, 264 N.E.2d 618, *cert. denied,* 402 U.S. 997, 91 S.Ct. 2183, 29 L.Ed.2d 163.

In the *Miranda* case the supreme court of the United States held:

" * * * General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present."

*Miranda, supra,* at 477–78, 86 S.Ct. at 1629–30.

In *Hatcher* our supreme court upheld the admission of statements given in response to general investigatory questions at a hospital. A clothing store had been robbed, and it was believed the bandit had suffered a gunshot wound. This information was radioed to police headquarters. Sometime later, a police officer who had heard the broadcast was called to the emergency room of a hospital to investigate a gunshot wound. She encountered the defendant who met the description of the clothing store bandit. The officer asked questions relating to name and identity. There were discrepancies in the defendant's answers, and he did not know the date of birth on the documents of identification he submitted to the officer. At first he refused to answer her questions as to how he was wounded, but eventually he stated he was shot in a crap game. Throughout the interview, the defendant was beligerant and the officer arrested him for disorderly conduct. The defendant was charged in the clothing store robbery and at trial sought to have his statements prior to his arrest excluded as he had not received his *Miranda* warnings. The supreme court held that he was not in custody at the time of the initial statements and "*Miranda* warnings are not required prior to general on the scene questioning related to obtaining the facts of the crime." *Hatcher, supra,* 410 N.E.2d at 1189.

Courts in other jurisdictions have held police questioning in a hospital to be "custodial interrogation" only where police have created or taken advantage of a coercive atmosphere. *Commonwealth v. Fisher,* (1976) 466 Pa. 216, 352 A.2d 26 (police

guard posted outside defendant's room for 48 hours); *Scales v. State*, (1974) 64 Wis.2d 485, 219 N.W.2d 286 (defendant placed under arrest prior to questioning); *Howard v. State*, (1969) 44 Ala.App. 595, 217 So.2d 548 (defendant under sedation); *State v. Ross*, (1968) 183 Neb. 1, 157 N.W.2d 860 (questioning occurred in hospital operating room while defendant was being prepared for surgery and thus immobile).

Where the situation is one where the questions are general and the defendant's freedom is not impeded, courts have been less likely to find that "custodial interrogation" took place. *People v. Clark*, (1977) 55 Ill.App.3d 496, 13 Ill.Dec. 338, 371 N.E.2d 33 (questions asked defendant were general questions asked in the course of fact finding process and defendant's answers were merely product of routine investigation); *State v. Gwaltney*, (1976) 31 N.C.App. 240, 228 S.E.2d 764 *cert. denied* 291 N.C. 449, 230 S.E.2d 767 (defendant not under arrest and questioning was necessary for preparation of required official accident report and was investigatory rather than accusatory); *Cummings v. State*, (1975) 27 Md.App. 361, 341 A.2d 294 (statements made by defendant were voluntary admissions where police questioning took place in defendant's hospital room, there was no restraint on the defendant, police did not act in threatening manner, time of questioning was reasonable, defendant's wife was present and there was no arrest or indications of arrest); *State v. Sandoval*, (1969) 92 Idaho 853, 452 P.2d 350 (defendant not under arrest, authorities had done nothing to restrain his freedom of action, and questioning had taken place in a hospital room with another patient present).

▮ Here Deputy Sheriff Goff testified that Orr was never under any restraints at the scene of the accident or in the hospital, and that he was never arrested or told he was under arrest. Officer Goff's questions were asked in preparation of her accident report (Orr was the third of six witnesses she talked to at the hospital), she did not act in a threatening manner towards Orr,

and her questions were of a general nature and not accusatory. Although Goff testified that Orr was extremely beligerent, did not want to talk to anyone, and wanted to get out of the hospital, there is no evidence that Orr specifically refused to talk to Goff or declined to answer her questions. In short, there is no evidence of a coercive atmosphere that is indicative of custodial interrogation and *Miranda* warnings were not required.

▮ Orr also argues the trial court was in error for not determining the voluntariness of his statements pursuant to 35–5–5–2 (repealed). This section applies to voluntariness of *confessions*. A confession must be sufficiently comprehensive so as to embrace all essential elements of crime. *Green v. State*, (1973) 159 Ind.App. 68, 304 N.E.2d 845. Orr's statements in which he simply stated that he had been drinking did not encompass all the elements of the crime, and were admissions rather than a confession. *Parsons v. State*, (1975) 166 Ind.App. 152, 333 N.E.2d 871. Thus, section 35–5–5–2 (repealed) is inapplicable.

In any case, the lack of custodial interrogation in Orr's case indicates that no coercive atmosphere was present and that the statements given were voluntary. *Lucas, supra; Hoskins, supra.*

▮ Additionally, Orr cites two statutes from the motor vehicle code concerning accident reports. He maintains that, because the State of Indiana requires accident reports by the police, any statement made by him was compelled and therefore not voluntary. IND.CODE 9–3–1–3 provides for information to be furnished to any person who has suffered injury in an auto accident. IND.CODE 9–4–1–51 states that accident reports are not to be used as evidence at trial.

No accident reports were admitted as evidence at trial, and we fail to see how any requirement of police recordkeeping can place an added compulsion on a person to answer questions.

▮ Lastly, Orr argues that he suffered serious injuries and, because of his

condition, the voluntariness of any statements made by him must be questioned. He fails, however, to offer any cogent argument as to how his condition impaired his mental capacity. While Orr may have been intoxicated at the time, his statements will still be admissible where it appears he understood the questions and was able to respond to them. *Parsons, supra; see also Feller v. State*, (1976) 264 Ind. 541, 348 N.E.2d 8.

Finally, we fail to see how Orr was harmed by his acknowledgement that he was drinking. Other testimony that stated: (1) he smelled of liquor, (2) an opinion by a police officer that he was intoxicated, and (3) results of a blood-alcohol test that his blood contained .19% alcohol, conclusively established this fact.

*Sufficiency of the Evidence*

Orr's argument of the sufficiency of the evidence is two-fold as follows: (A) insufficient proof of causation, and (B) insufficient proof of intoxication. When reviewing the sufficiency of the evidence, this court can neither reweigh the evidence nor judge the credibility of the witnesses. On appeal, we can only look to the evidence most favorable to the State and all reasonable inferences which can be drawn therefrom. If there is substantial evidence of probative value from which the trier of fact could find the defendant guilty, then we must affirm the conviction. *McDowell v. State*, (1983) Ind., 456 N.E.2d 713; *Warner v. State*, (1983) Ind., 455 N.E.2d 355.

Orr claims the State merely proved an accident occurred and that it was caused by him, but failed to link his alleged intoxication to the accident in any way. On the contrary, there was clearly evidence presented linking the defendant's intoxication to the accident.

There was testimony not only that Orr was traveling at an excessive rate of speed, but also that his reactions were affected— he did not swerve away from the truck until he was almost upon it, he did not apply the brakes as he crossed over into the oncoming lane, and he did not try to avoid the collision in any way. From this a jury could have reasonably concluded the accident was a natural and probable consequence of Orr's intoxication. *See Pollard v. State*, (1982) Ind.App., 439 N.E.2d 177.

Orr also argues that the State failed to prove intoxication. The results of the blood test alone, however, constitute prima facie evidence of Orr's intoxication. IND. CODE 9–4–1–54. In addition Deputy Goff testified that she was without a doubt that Orr was intoxicated. There was certainly substantial evidence of probative value presented at trial to support the verdict.

The judgment is affirmed.

SHIELDS, J., concurs.

SULLIVAN, J., dissents with separate opinion.

SULLIVAN, Judge, dissenting.

I respectfully dissent from that portion of the majority opinion which holds admissible the results of the blood-alcohol test. I would reverse and remand for a new trial.

Orr's challenge to the adequacy of the foundation relative to the accuracy of the blood-alcohol test concerns the proper testing of the control sample. At the suppression hearing and at trial, Orr presented his expert witness, Dr. Frajola, who testified that accurate results could not be obtained unless an independent test was first conducted upon the control sample to determine that it was devoid of the substance for which the other samples were to be tested—in this instance, ethyl alcohol, and that this independent test must be conducted *before* the known quantity of alcohol is added to the control sample; otherwise, the tester cannot be certain that the control sample is pure and contains only the substances added for purposes of the testing procedure. According to Frajola, the test cannot be presumed to be accurate unless this preliminary step is performed. Frajola stated that because Naomi Carey did not perform a preliminary test on the control sample to determine that it contained no alcohol, the test results could not be accu-

rate. In arguing this point, Orr places great importance on Carey's "sniff test" and the inherently unscientific nature thereof. The significance of this issue, however, is not that Carey smelled the blood for alcohol, but whether she omitted the preliminary test on the control sample to determine that it was devoid of alcohol, which, in turn, may control the reliability of the test results. The issue which confronts us, therefore, is whether the evidence of Carey's failure to test the control sample for alcohol is fatal to the admissibility of the test results, or whether it more properly goes to the weight to be accorded the blood-alcohol analysis.

The general rule for the admission of blood-alcohol test results is that a proper foundation must first be established to show the reliability of the analysis. An examination of Indiana cases addressing the foundational requirements discloses a number of essentials upon which admissibility must be predicated. Among these, the party offering the blood-alcohol evidence must establish (1) the integrity of the blood sample by showing that its purity was preserved. *Conrad v. State* (1974) 262 Ind. 446, 317 N.E.2d 789, (2) the identity of the blood sample by showing a sufficient chain of custody, *Fendley v. Ford* (2d Dist. 1984) Ind.App., 458 N.E.2d 1167; *Orr v. Econo-Car of Indianapolis, Inc.* (1971) 150 Ind.App. 411, 276 N.E.2d 524, (3) the qualifications of the technician who performed the test, *Pollard v. State* (1st Dist.1982) Ind.App., 439 N.E.2d 177; *Shultz v. State* (2d Dist.1981) Ind.App., 417 N.E.2d 1127, and (4) the accuracy of the test by showing that it was conducted properly. *See Shultz v. State, supra; Thompkins v. State* (1978) 270 Ind. 163, 383 N.E.2d 347, and *State v. Alderson* (3d Dist.1982) Ind.App., 435 N.E.2d 614. With the exception of the last requirement, there is ample case law addressing and elaborating upon each of the above propositions. However, for purposes of admissibility, it is not altogether certain what constitutes the proper performance of a blood-alcohol test upon a blood specimen. Cases which hold such tests admissible, *e.g., Shultz v. State, su-*

*pra*, 417 N.E.2d at 1137; *Thompkins v. State, supra*, 383 N.E.2d at 351, assume the existence of some evidence that the test in question was properly conducted. *See also Jones v. State* (1981) Ind., 425 N.E.2d 128. *But see State v. Alderson, supra*, 435 N.E.2d at 615–616 (in which the exclusion of test results was affirmed for failure by the State to establish that appropriate tests were conducted and thus a failure to lay a proper foundation for the admission.) Although there are no reported Indiana cases addressing the admissibility of blood test results for alcohol content in which the technician's test procedures have been challenged as improper, commentators and authorities are in agreement that as a foundational prerequisite for admission of medical or scientific test results, including blood-alcohol test results, it must be shown that the test was conducted properly so as to obtain accurate results. *See*, Richardson, J., *Modern Scientific Evidence*, 2d Ed. Ch. 13, § 13.10 *et seq.*, p. 397; Conrad, 1 *Modern Trial Evidence*, 1966 Supp., § 713, p. 213–214; Donigan, *Chemical Tests and the Law*, (1950) p. 71–80; Erwin, *2 Defense of Drunk Driving Cases*, 3d Ed., § 22.04, p. 22–41.13; McCormick, *Evidence*, 2d Ed., § 209, p. 511–513; 29 Am.Jur.2d, *Evidence*, 1983 Supp., §§ 829, 830. *See also*, Johnson, D., *Blood Test Results—Their Admissibility to Show a Decedent's Intoxication*, 38 Ind.L.J. 603, 614–617.

Many states have enacted statutes setting forth test procedure standards upon which admission of blood-alcohol tests are conditioned. Frequently, these statutes require the blood-alcohol analysis to be performed in compliance with guidelines established by a state health agency. *See, e.g., State v. Pickering* (1983) Me., 462 A.2d 1151; *State v. Miller* (1983) 213 Neb. 274, 328 N.W.2d 769; *State v. Green* (1982) La., 418 So.2d 609; *State v. Erickson* (1976) N.D., 241 N.W.2d 854. Our legislature has enacted similar statutes containing specific foundational requirements for admission of breathalyzer test results. *See* I.C. 9–11–4–5 (Burns Code Ed., 1984 Supp.). However, there are no Indiana statutory re-

quirements for the admission of blood or urine analyses which determine the alcohol content. Because no Indiana case addresses the immediate issue, decisions in other states are of assistance.

In *State v. Erickson* (1976) N.D., 241 N.W.2d 854, the defendant, who had been charged with negligent homicide in connection with driving while under the influence of alcohol, challenged the admissibility of his blood-alcohol test results, alleging that the state had failed to show that the test was "fairly administered" as required by North Dakota statute. The laboratory technician who had performed the analysis of the defendant's blood, with the use of a gas chromatograph, had not conducted a spot check of the "known solution" to determine that it contained the chemicals it was supposed to contain. The defendant relied upon an earlier North Dakota case in which the court had held that the results of a breathalyzer test conducted by a police officer who had failed to perform a similar spot check of the ampoules containing the "known solution" were inadmissible because the test was not shown to have been properly administered. *See State v. Salhus* (1974) N.D., 220 N.W.2d 852. The Supreme Court of North Dakota first noted a considerable distinction between a police officer, whom it characterized as a layman in the field of toxicological testing, in conducting a relatively simple breathalyzer test, and a laboratory technician who performed blood tests in a controlled environment and under the supervision of the State Toxicologist, who was a state officer charged with specific statutory duties. The court also recognized a distinction in the use of a gas chromatograph as opposed to a breathalyzer machine, in that the gas chromatograph is a far more sophisticated and complex instrument, requiring for its operation the services of highly trained technicians or chemists. Given these distinctions, the court stated:

> "We believe a laboratory technician performing a service under the supervision and direction of the State Toxicologist is performing an official act which is entitled to a disputable presumption of regu-

larity pursuant to § 31–11–03(15), NDCC, *until contradicted by other evidence. No contradictory evidence was introduced.* Therefore, the presumption stands." *Erickson, supra,* 241 N.W.2d at 865 (citations omitted). (Emphasis supplied)

The *Erickson* case is distinguishable from the instant case in three respects. First, there were statutory guidelines in that state upon which the admission of test results were predicated. However, the specific statutory requirement that the test be "properly administered" is no more precise than the general requirement, heretofore discussed, that the tests be conducted accurately. Second, the laboratory technician in *Erickson* labored under a statutory duty which, in the court's view, lent greater reliability to the procedures used and the results derived. Notwithstanding these distinctions, the approach adopted by the North Dakota Supreme Court states a viable solution to the immediate problem. That is, where a trained and experienced laboratory technician, chemist, or toxicologist is employed to conduct testing and analyses of blood specimens in a laboratory whose business is the securing, handling, and analysis of blood specimens, among other types of specimens, the testing procedures and results are entitled to a disputable presumption of regularity until and unless contradicted by other evidence. Third, and most importantly, unlike the *Erickson* case, in the case before us there was evidence which tended to place the accuracy of the test in question. In *State v. Tiernan* (1973) Iowa, 206 N.W.2d 898, the defendant challenged the admissibility of the results because the state did not show that a particular tube in the gas chromatograph had heated properly, nor that certain moisture did not alter the test results. However, the chemist, in that case, was able to dispel the doubts as to the accuracy of the results. The chemist testified that if for some reason, the tube in question had not heated properly, the analysis would have revealed an impossibly high reading and the test would have been rejected. The

chemist also testified that the presence of moisture, similarly, would have invalidated the entire test procedure rather than merely altering the results obtained. Given this reassurance, the Supreme Court of Iowa held that the state had established a "sufficient foundation of the scientific principles and condition of the devices for admission of the evidence." 206 N.W.2d at 901.

In the case before us Carey's testimony, initially, was sufficient to create a presumption that she utilized proper procedures and obtained an accurate result. Her testimony evinces a thorough understanding of the principles and procedures of gas chromatography. She is highly trained and possesses years of experience in laboratory work. Under such circumstances, and in the absence of contradictory evidence, the accuracy of her test procedure and result may be presumed. However, contradictory evidence was introduced which was sufficient to cast considerable doubt on the propriety of the procedures followed on this particular occasion, and thus, on the accuracy of the test result. Dr. Frajola, also an expert, testified that Carey's failure to conduct a preliminary test on the control sample to determine that it was devoid of alcohol, in his opinion, subjected the results to inaccuracy. His testimony is sufficient to rebut the presumption of regularity and to cast upon the state the burden of going forward with other evidence relative to the accuracy of the procedures and results.

I am satisfied that in most cases, highly trained medical personnel who perform laboratory analyses, which often provide the basis for medical diagnosis and treatment, will perform their tasks carefully and in a manner which is acceptable in the relevant medical or scientific communities. In *Woolley v. Hafner's Wagon Wheel, Inc.* (1961) 22 Ill.2d 413, 176 N.E.2d 757, the Illinois Supreme Court states:

"If the routine and procedures of a laboratory are shown by the evidence as having been commonly accepted by the medical profession, and the business of the laboratory is the security, handling, and analysis of blood specimens, amongst other types of specimens, these routines and procedures ought to be acceptable to the courts."

However, even highly trained specialists are susceptible to mistake, oversight, and even carelessness. Therefore, when the opponent brings forth evidence of an actual error or omission in the testing procedure, the proponent of the evidence should be able to attest to the propriety of the procedures used and to vouch for the reliability of the test results. This is because the proponent is in a far better position, and has at his command the facts necessary, to prove that his procedure was proper and his conclusion, reliable. In the instant case, to require the challenger to show that the control sample did contain ethyl alcohol, such as would render the test result inaccurate, would be to impose an undue burden and a virtually insurmountable obstacle.

It may be that the failure to test the control sample for alcohol would not necessarily control the reliability of the test results. It appears logical to one untrained in science that the effect of a control sample which did, per chance, contain alcohol would be to show a smaller variance in the alcohol content of Orr's blood *vis-a-vis* the control sample, and therefore, a lower blood-alcohol level than what truly existed in Orr's blood. If this hypothesis were correct, it would operate in Orr's favor. Without evidence to support it, however, the conclusion is sheer supposition.

I have searched the record for evidence which might assuage my doubt as to the reliability of the test procedure, as conducted on this occasion, and have found none. Carey did not testify that she conducted the test in compliance with Methodist Hospital procedures. She did not testify that the test, as she conducted it, complied with standard or accepted procedures in the relevant medical or scientific communities. She did not testify that, despite Dr. Frajola's testimony, it was not necessary to conduct a preliminary test on the control sample in order to obtain accurate test results.

She did not testify that the possibility of her control sample containing ethyl alcohol before she added the known solution was remote at best. In fact, there is no testimony regarding the purity of the sample Carey obtained from the hematology lab. Finally, she did not testify that her omission, if it was an omission, would not control the accuracy of the results. Unlike the chemist in *Tiernan, supra,* 206 N.W.2d 898, who was able to answer the defendant's challenges to the proper functioning of the gas chromatograph, Carey's testimony fails to address the challenge to her procedures posed by Dr. Frajola, and, I am unable, on the record before me, to ascertain whether she might have successfully defended her procedures.

In short, the State simply failed to offer any facts which would allow the trial court or us to conclude that the blood-alcohol analysis was conducted, in this instance, in a manner calculated to produce accurate and reliable results. An adequate foundation was not established. Therefore, in my view, the blood-alcohol results were erroneously admitted.

My conclusion finds no contradiction in the case of *Reid v. State* (1978) 267 Ind. 555, 372 N.E.2d 1149, wherein the supreme court stated:

"The fact that a scientific test is subject to error if not properly conducted is not a reason for rejecting evidence adduced by such a test. The persuasiveness of the evidence is in large measure dependent on the expertise of the witness who conducted it and in the final analysis is to be determined by the jury after the opportunity for cross-examination."

Although the above language might lead one to believe that test procedures were at issue in *Reid,* an examination of the case reveals otherwise. In that case, a trace metal detection technique (TMDT) was administered to the defendant's hand to detect minute traces of metal remaining upon flesh which had come into contact with metal objects. The test procedure itself was simple, and involved only the spraying of the defendant's hand with a commercial-ly prepared chemical solution which is then placed under a special light. The light reveals a purplish glow where there are metal tracings. The challenge to admissibility, in *Reid,* was *not* to the propriety of the test procedure used, as in the instant case, nor the accuracy of the results. Rather, the defendant challenged the scientific reliability of the entire technique, likening the TMDT to a lie detector test. The defendant urged that the entire TMDT was inherently unreliable. Thus, the issue in *Reid* was the scientific validity of the test, *per se.* This is not an issue in the instant case concerning the gas chromatograph. All parties concede the scientific validity and reliability of gas chromatography, if conducted properly. Therefore, under the facts of this case, *Reid* is inapposite.

Likewise, the instant case is distinguished from *Martin v. Roberts* (1984) Ind., 464 N.E.2d 896. In that case, the supreme court overturned *Martin v. Roberts* (2d Dist.1983) Ind.App., 452 N.E.2d 182, and held that the expert opinion testimony of a state trooper as to the speed of a vehicle was admissible despite the trooper's failure to use any formula, calculation, or principle in adducing the speed at which the vehicle had been traveling, and his failure to take into account the structure, weight, or load of the vehicle. Our supreme court determined that any deficiency in accounting for these elements went to the weight of the trooper's estimate of speed rather than to its admissibility.

The focus of *Martin v. Roberts,* as is relevant here, is upon the admissibility of an expert's testimony as to his opinion, based upon his credentials as an expert and his measurements and visual observations at the accident scene, although he did not personally witness the accident. The instant case does not concern the admissibility of expert *opinion,* although the testimony of an expert is necessary to the admissibility of the blood test results. Rather, the focus of the instant case is upon the admissibility of a scientific fact—the objective and precise measurement of the alcohol content of a particular blood sample based

upon technical principles of scientific measurement and testing, the accuracy of which is controlled by the manner in which the measurement is taken. Naomi Carey's testimony as to the blood-alcohol content of Orr's blood sample was not a statement of her opinion as to the level of alcohol content. To the contrary, it was testimony of scientific *fact*. For that reason, any defect in the procedures used to ascertain that fact, which affect the accuracy of the fact must necessarily render the fact, or the test result, inadmissible and prejudicial to the defendant. I disagree with the majority conclusion that we are confronted merely with conflicting expert opinion. In the case before us we do not have conflicting expert opinions regarding the propriety of the test procedure. If we did, I would agree that the test results might be admitted and the trier of fact be advised that they may weigh the conflicting opinions and according to that assessment lend such weight, if any, as might be appropriate.

Here, however, we have only an opinion by one expert that an admittedly omitted test procedure was necessary to assure the accuracy of the test result. We do not have a conflicting opinion that the omitted procedure was not necessary either because result accuracy could not be adversely affected thereby, or that accuracy was assured by other procedures used instead of the omitted procedure.

The blood-alcohol analysis was not the only evidence of Orr's intoxication. Officer Goff and Officer Madison testified that they smelled alcohol on Orr's breath at the scene of the accident. Officer Carrico testified that he smelled alcohol on Orr's breath at the hospital; that Orr exhibited loud and boisterous behavior; and that Orr's speech was slurred. Officers Goff and Carrico both testified that in their many years of law enforcement experience they each had numerous occasions to observe persons who were intoxicated and that in their opinion, based upon their observation of Orr's behavior, he was intoxicated. The passengers in the car passed by Orr, just before he struck the decedents' car, testified that they saw Orr's head as

he passed them but they did not see his head as his car veered to the left, implying that he had fallen over on the seat. Indeed, Orr was found entrapped on the floor of his car, his body stretched cross-wise and his head on the passenger side. Finally, Orr admitted that he had been drinking at two westside Indianapolis taverns just prior to the accident.

These facts alone may have been sufficient to satisfy the jury that Orr was intoxicated, and thus support the verdict. However, I am unable to conclude that the jury's decision was not significantly influenced by the improperly admitted blood-alcohol test results or that the remaining evidence is so overwhelming as to support the verdict as a matter of law. *See Mulry v. State* (2d Dist.1980) Ind.App., 399 N.E.2d 413. I would reverse and remand for a new trial.